## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA RIGHT TO LIFE and MINNESOTA GUN RIGHTS,<br><br>       Plaintiffs,<br><br>      v.<br><br>FARIS RASHID, in his official capacity as Chair of the Minnesota Campaign Finance and Public Disclosure Board, CAROL FLYNN, in her official capacity as a member of the Minnesota Campaign Finance and Public Disclosure Board, STEPHEN SWANSON, in his official capacity as a member of the Minnesota Campaign Finance and Public Disclosure Board, GEORGE SOULE, in his official capacity as a member of the Minnesota Campaign Finance and Public Disclosure Board, and DAVID ASP, in his official capacity as a member of the Minnesota Campaign Finance and Public Disclosure Board, JEFF SIGURDSON, in his official capacity as the executive director of the Minnesota Campaign Finance and Public Disclosure Board, MEGAN ENGELHARDT, in her individual and official capacity as the assistant executive director of the Minnesota Campaign Finance and Public Disclosure Board, JOHN CHOI, in his official capacity as the Ramsey County Attorney, KATHRYN M. KEENA, in her official capacity as the Dakota County Attorney, and MARY MORIARTY, in her official capacity as the Hennepin County Attorney,<br><br>       Defendants. | Case No: _____<br><br>Judge: _____<br><br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF** |

INTRODUCTION

The First Amendment restricts the government's ability to condition the right to speak about public policy on one's willingness to disclose private information. In today's climate of doxxing and cancelling anyone who might voice dissenting opinions, that protection is often the difference between speaking freely and not speaking at all. "The risks of public disclosure are heightened in the 21st century and seem to grow with each passing year, as anyone with access to a computer can compile a wealth of information about anyone else, including such sensitive details as a person's home address or the school attended by his children." *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022) (cleaned up). And that information can subject individuals to "harassment or even risk of personal harm." *Id.*

Minnesota's sweeping disclosure rules for any speech the state deems "lobbying" raise exactly those kinds of problems. The state requires that advocacy organizations register their speech with the government (and disclose it to the public) whenever they spend money to communicate with other people and urge them to contact their representatives about legislative activity. And for any advertising costs greater than $2,000, Minnesota requires advocacy organizations to publicly identify their vendor's name and address. When "public disclosure" often leads to "harassment or even risk of

2

personal harm," *id.*, Minnesota practically gift wraps potential targets for activists looking to drive dissenting voices out of the public square.

Yet Minnesota lacks any interest in regulating speech among private parties in this way. Grassroots advocacy aimed at gathering like-minded individuals to express their own personal opinions about government activity raises none of the usual concerns about *quid pro quo* corruption that typically justify such disclosure rules. Nor is there any informational interest—other than mere "curiosity"—that supports conditioning protected speech on revealing information about one's private advocacy. *Calzone v. Summers*, 942 F.3d 415, 424–25 (8th Cir. 2019) (en banc). The only purpose this disclosure law serves is to dissuade controversial speakers from making their voices heard.

The Court should end this unlawful disclosure regime and prevent Minnesota from further infringing on the First Amendment rights of advocacy organizations and similar people throughout the state.

JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the plaintiffs assert claims against the defendants arising under federal law.

2.     This Court is the proper venue because a "substantial part of the events . . . giving rise to the claim[s] occurred" in the district, 28 U.S.C.

§ 1391(b)(2), and all the defendants reside in this district, 28 U.S.C.

§ 1391(b)(1).

PARTIES

3.      Minnesota Right to Life is a non-profit, non-partisan organization

located in Dakota County, Minnesota, that advocates for the lives of all

unborn children in Minnesota. Founded in 2017, MNRTL's mission includes

mobilizing grassroots voters across Minnesota to demand that their

legislators support legislation recognizing that life and personhood begins at

conception, as well as opposing pro-abortion laws.

4.      Minnesota Gun Rights is a non-profit, non-partisan advocacy

organization located in Hennepin County, Minnesota, that is dedicated to

informing gun owners, voters, and liberty activists in Minnesota about the

position of public officials and candidates for office on legislation related to

Second Amendment issues. Like MNRTL, MGR communicates with

supporters, donors, and the public in Minnesota to educate them about

government activity related to gun rights, urging people to advocate to

elected officials about Second Amendment rights and personal

responsibilities.

5.      MNRTL and MGR purchase goods and services from vendors.

6.      Defendant Faris Rashid is Chair of the Minnesota Campaign

Finance and Public Disclosure Board, which is the state agency that

4

administers and enforces Minnesota's Campaign Finance and Public Disclosure Act, Minn. Stat. § 10A.01, *et seq.* The plaintiffs are suing Rashid in his official capacity.

7.    Defendant Carol Flynn is a member of the Minnesota Campaign Finance and Public Disclosure Board. The plaintiffs are suing Flynn in her official capacity.

8.    Defendant Stephen Swanson is a member of the Minnesota Campaign Finance and Public Disclosure Board. The plaintiffs are suing Swanson in his official capacity.

9.    Defendant George Soule is a member of the Minnesota Campaign Finance and Public Disclosure Board. The plaintiffs are suing Soule in his official capacity.

10.    Defendant David Asp is a member of the Minnesota Campaign Finance and Public Disclosure Board. The plaintiffs are suing Asp in his official capacity.

11.    Jeff Sigurdson is the executive director of the Minnesota Campaign Finance and Publish Disclosure board. The plaintiffs are suing Sigurdson in his official capacity.

12.    Megan Engelhardt is the assistant executive director of the Minnesota Campaign Finance and Public Disclosure board. The plaintiffs are suing Sigurdson in her individual and official capacities.

5

13.    Defendant John Choi is the county attorney for Ramsey County, Minnesota. The county attorney has limited enforcement authority to seek injunctive relief to enforce Chapter 10A. Minn. Stat. § 10A.34 subd. 2. The plaintiffs are suing Choi in his official capacity.

14.    Kathryn M. Keena is the county attorney for Dakota County, Minnesota. The county attorney has limited enforcement authority to seek injunctive relief to enforce Chapter 10A. Minn. Stat. § 10A.34 subd. 2. The plaintiffs are suing Keena in her official capacity.

15.    Mary Moriarty is the county attorney for Hennepin County, Minnesota. The county attorney has limited enforcement authority to seek injunctive relief to enforce Chapter 10A. Minn. Stat. § 10A.34 subd. 2. The plaintiffs are suing Keena in her official capacity.

Facts

*Minnesota imposes extensive disclosure rules on grassroots advocacy*

16.    Minnesota requires all "lobbyists" to report information about their lobbying activity several times each year. *See generally* Minn. Stat. § 10A.04. That includes those who one would naturally think of as a lobbyist—individuals paid by another to communicate with a public official to influence government activity.

17.    But Minnesota's definition of lobbying also captures grassroots activists—individuals or organizations who do not talk to public officials at

all, but instead talk to other private parties to rally support for a specific

cause. Minnesota's definition of "lobbying" includes any "attempt[] to

influence legislative action, administrative action, or the official action of a

political subdivision by communicating with or *urging others to communicate*

*with* public officials or local officials." Minn. Admin. Code § 4511.0100 subp. 3

(emphasis added). It also includes "[a]ny activity that directly supports this

communication." *Id.* Thus, telling a friend or family member that they should

call their local representative's office and urge him or her to vote against a

bill pending in the legislature constitutes "lobbying" under Minnesota law.

18.    The reporting requirements for lobbying break into two categories:

lobbyists and principals. A lobbyist "means an individual" who is paid more

than $3,000 annually to lobby, who spends more $3,000 annually of his or her

own personal funds to lobby, or who offers consulting services for an

organization that facilitates government relations and affairs. Minn. Stat.

§ 10A.01 subd. 21(a). A principal, on the other hand, "means an individual or

association that" pays a lobbyist over $3,000 a year, or who "spends a total of

at least $50,000 in any calendar year to influence legislative action,

administrative action, or the official action of political subdivisions." *Id.*

§ 10A.01 subd. 33.

19.    Principals must report the "total amount" spent on lobbying each

year, divided into different categories (legislative, administrative, public

utilities, and local government). *Id.* § 10A.04 subd. 6(b). The "total amount"

spent on lobbying must be "rounded to the nearest $5,000," and includes:

> (1) the portion of all direct payments for compensation and benefits
> paid by the principal to lobbyists in this state for that type of lobbying;

> (2) the portion of all expenditures for advertising, mailing, research,
> consulting, surveys, expert testimony, studies, reports, analysis,
> compilation and dissemination of information, communications and
> staff costs used for the purpose of urging members of the public to
> contact public or local officials to influence official actions, social media
> and public relations campaigns, and legal counsel used to support that
> type of lobbying in this state; and

> (3) a reasonable good faith estimate of the portion of all salaries and
> administrative overhead expenses attributable to activities of the
> principal for that type of lobbying in this state.

*Id.* § 10A.04 subd. 6(c).

20.    Principals must also report itemized expenditures "that exceed

$2,000 for paid advertising used for the purpose of urging members of the

public to contact public or local officials to influence official actions during the

reporting period." *Id.* § 10A.04 subd. 6(d). "Paid advertising includes the cost

to boost the distribution of an advertisement on social media." *Id.*

21.    Notably, this itemized-expenditure report "must provide the date

that the advertising was purchased, *the name and address of the vendor*, a

description of the advertising purchased, and any specific subjects of interest

addressed by the advertisement." *Id.* (emphasis added).

8

22.    Not every organization that lobbies must follow these rules. Minnesota exempts public officials, expert witnesses, political parties, and others from reporting their lobbying activities or associated vendors. *Id.* § 10A.01 subd. 21(b).

23.    One exemption applies to news organizations and their employees. Minnesota exempts from its lobbying laws "a news medium or its employees or agents while engaged in the publishing or broadcasting of news items, editorial comments, or paid advertisements, which directly or indirectly urge official action." *Id.* § 10A.01 subd. 21(b)(7). This exemption applies to both lobbyists and principals. Campaign Fin. & Pub. Disclosure Bd. Advisory Op. 463 at 4 (June 5, 2024), https://perma.cc/AG4G-B8U4.

24.    The Campaign Finance and Public Disclosure Board interprets the news-medium exemption broadly. It applies to "any system or method through which a speaker or writer provides news to their audience." *Id.* at 2. That means "editorial commentary" published through a "news medium" does not qualify as lobbying, even if made by "a guest or host of a talk, television, radio or podcast show." *Id.* at 2–3. It also means that employees of a "news medium" are not required to report advocacy about government activity, "including a call to action for reform or a legislative fix," as well as "calling for listeners or readers to take action" related to "a current legislative proposal or future legislation." *Id.* at 3.

9

25.    Principal reports, including the name and address of a principal's vendors, are publicly available on the Campaign Finance and Public Disclosure Board's website, which is located at https://cfb.mn.gov/.

26.    Principals who fail to timely file their disclosure report are subject to late fees and civil penalties up to $2,000. Minn. Stat. § 10A.04 subd. 5. Filing a false report, however, or a report that omits required information, carries a higher penalty—$3,000—and constitutes a criminal misdemeanor. Minn. Stat. § 10A.025 subd. 2(b), (d).

*Plaintiffs engage in grassroots advocacy in Minnesota*

27.    Plaintiffs are non-profit advocacy organizations that often communicate with their members, donors, and the public about legislative and other government activity in Minnesota.

28.    How that communication works varies based on the circumstances. When Plaintiffs anticipate an issue in a future legislative session, they engage in educational advocacy so their supporters will understand the issue before a bill is proposed. Plaintiffs also inform people about real-time legislative activity, urging them to take action by signing petitions and contacting their representatives. These communications take many forms— including social media ads, text messages, email blasts, direct mail, and even radio spots.

29.    For example, if a bill related to gun rights is moving through the legislature, MGR might send a mass text message to supporters letting them know what the bill is about and asking them to contact their legislator before the vote. Other times, Plaintiffs have more notice about a bill, which gives them time to coordinate a direct-mail advertising campaign. Each form of advocacy has benefits and drawbacks, and so Plaintiffs vary their approach as the circumstances demand.

30.    Some advertising campaigns are expensive. Radio ads and direct mail often cost thousands of dollars to produce and distribute. Plaintiffs often rely on direct mail to reach supporters (or potential supporters), which requires paying vendors to create the direct mail and distribute it. Other advertising has more variable costs. A social-media campaign, for example, might start small, but then grow after Plaintiffs see success and decide to amplify it.

*Activists frequently target Plaintiffs and their vendors*

31.    Neither Plaintiff would voluntarily disclose their grassroots advocacy or vendor associations.

32.    Both MGR and MNRTL speak on controversial topics—abortion and gun rights—and doing so often draws pushback and counter-speech from those who disagree. Some of that is expected—it comes with the territory

when speaking on issues that draw passionate debate. But Plaintiffs have experienced harassment beyond reasonable civic engagement.

33.     Throughout their years of operation, Plaintiffs have been subjected to harassment, doxxing, death threats, and other intimidation tactics aimed at driving them out of the public square. In one example, an individual emailed Ben Dorr (the executive director of MGR and MNRTL) several years ago after discovering his office address. He asked whether that address was accurate (it was) and said he was going to kill Dorr. In another example, someone posted Dorr's home address on Facebook along with a comment about going to his house to "f*ck him up." That comment had over 150 "likes." At the time, Dorr was out of state and his wife was at home and 9 months pregnant. So he called the police department and asked them to send an officer over to make sure nobody showed up.

34.     This harassment often extends beyond Plaintiffs themselves as activists target Plaintiffs' vendors, hoping to coerce them into cutting off business with Plaintiffs, making it more difficult—or even impossible—for Plaintiffs to operate.

35.     MNRTL experienced one example of this kind of harassment in early 2020, soon after it launched an outreach effort aimed at building support and collecting donations. The campaign relied heavily on direct mail—an expensive form of advertising that requires coordinating with

multiple vendors to design and ship mailers to known or potential supporters. The outreach effort was initially successful. MNRTL experienced a large response rate from recipients, collecting donations and building a list of supporters and donors for future advocacy efforts.

36.    Soon after the initial campaign, however, activists discovered MNRTL's mailbox vendor, and they launched a pressure campaign to have the vendor cut off MNRTL's service. Activists began calling the vendor and showing up at its store in person, demanding that the vendor stop doing business with MNRTL. This harassment worked. The vendor cancelled MNRTL's mailbox without warning. It cut off MNRTL's access, preventing MNRTL from collecting mail in the middle of an outreach campaign during which MNRTL was daily receiving new names of supporters and donations. MNRTL eventually found a new vendor, but not before losing thousands of dollars in the process. And it never recovered some of its mail, which likely included additional donations and contact information for new supporters responding to MNRTL's direct mail.

37.    MNRTL's experience in early 2020 was not an isolated incident. Both Plaintiffs have seen similar harassment and intimidation directed toward other vendors as well. In another example, people targeted one of Plaintiffs' vendors that provides member management and advocacy tools—services that allow Plaintiffs to easily contact supporters and analyze data to

make their advocacy more effective. Activists tried to deplatform Plaintiffs by having the vendor cancel their service. This caused a significant strain on their relationship, which eventually led to Plaintiffs finding a new vendor.

38.    As a result of this kind of harassment, Plaintiffs have been deplatformed by vendors providing a variety of services, including fundraising management and email distribution. Not only does this disrupt Plaintiffs' operations, making it more difficult for Plaintiffs to engage in grassroots advocacy, but Plaintiffs have also lost valuable assets such as donor lists in the process.

### Minnesota's disclosure law chills Plaintiffs' speech and raises the risk of harassment and intimidation

39.    Plaintiffs' experience makes them value the privacy of their associations, including their relationships with vendors who make their grassroots advocacy possible. Whenever the identity of a vendor is published, the risk that activists will target that vendor for harassment or intimidation increases. And so Plaintiffs work to keep their vendor relationships as private as possible to prevent future problems from arising.

40.    But Minnesota law prevents Plaintiffs from keeping the identity of all their vendors private. It requires Plaintiffs to disclose the name and address of any vendor Plaintiffs pay more than $2,000 for expenses related to paid advertising urging others to contact their public officials to influence

14

official action. Minn. Stat. § 10A.04 subd. 6(d). Thus, if Plaintiffs pay a shipping vendor $5,000 for a direct mail campaign alerting their supporters about an upcoming vote and urging them to contact their legislator, Plaintiffs must publicly identify that vendor's name and address. MNRTL has already experienced one distribution vendor refusing to do business with MNRTL after its relationship with MNRTL was publicized. Neither Plaintiff can afford for that to happen again.

41.     Because of this law, both Plaintiffs now avoid as much as possible any advertising expenses that would require disclosing their vendors. That means Plaintiffs are sometimes engaging in less speech than they otherwise would to avoid the disclosure rules. It also means Plaintiffs are choosing cheaper, but sometimes less effective advertising, for the same reason. And Plaintiffs will continue to limit their advertising costs going forward to avoid triggering the disclosure rules.

42.     But Plaintiffs cannot always avoid the $2,000 threshold. In 2024—the most recent reporting period—MGR met the statutory trigger for disclosing vendors at least eight times. It paid a third-party vendor thousands of dollars to produce and distribute several direct-mail advertisements urging people to contact their elected officials about pending legislation. MNRTL did the same on a dozen or more occasions. This form of

grassroots advocacy is critical for both Plaintiffs, and it often involves expenditures over $2,000.

43.    The chilling effect from disclosure is increased by the law's vagueness, which makes it difficult for Plaintiffs to determine whether a disclosure is even required. Plaintiffs do not know, for example, whether the law captures an advertising campaign that costs more than $2,000 but is paid in multiple increments smaller than $2,000. Nor do Plaintiffs know whether the reporting requirement captures only advertisements that expressly urge action to influence government activity, or if indirect advocacy qualifies as well. Nor can Plaintiffs discern whether a single invoice that pays a vendor for discrete services (*e.g.*, production and distribution), each of which is less than $2,000 but together exceeds the threshold, triggers the law. This vagueness further chills Plaintiffs' speech, as they worry about liability for underreporting advertising that should have been disclosed.

44.    Plaintiffs thus face an impossible set of choices: limit their own protected speech to avoid disclosure, disclose private information that could subject themselves or their vendors to harassment, pay civil penalties for failing to file, or even face criminal penalties for filing a report that omits information about their vendors and grassroots advocacy.

45.    Plaintiffs have not yet filed their principal reports for 2024.

16

46.    Plaintiffs worry about the ramifications of disclosing private vendor information but face criminal liability if they file with information omitted. Minn. Stat. § 10A.025, subd. 2(b), (d).

47.    On April 1, 2025, Defendant Megan Engelhardt, the assistant executive director of the Campaign Finance and Public Disclosure Board, contacted Plaintiffs by mail.

48.    In the correspondence, Engelhardt informed Plaintiffs that they must file their principal reports or else face civil penalties up to $1,000.

49.    Engelhardt also threatened in the correspondence to bring a civil action against Plaintiffs if they fail to file the report or pay the fees and penalties.

COUNT ONE

RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV – 42 U.S.C. § 1983
FACIAL AND AS-APPLIED CHALLENGE TO THE PRINCIPAL REPORTING
REQUIREMENTS FOR GRASSROOTS LOBBYING

50.    The plaintiffs reallege and incorporate by reference all preceding allegations.

51.    Minnesota's definition of "lobbying" captures grassroots advocacy that urges third parties to contact public officials for the purpose of influencing government activity. Minn. Admin. Code § 4511.0100 subp. 3. Minnesota requires principals to report information about this grassroots

activity, including the topics discussed and the total amount spent on such speech. Minn. Stat. § 10A.04 subd. 6.

52.    "A statute compelling disclosure of information to the government related to political activity is typically subject to exacting scrutiny." *Dakotans for Health*, 52 F.4th at 389 (cleaned up). Exacting scrutiny "is just short of strict scrutiny." *Id.* It "requires a substantial relation between the disclosure requirement and a sufficiently important interest." *Id.* (cleaned up). And it requires that the disclosure rule "be narrowly tailored to the government's asserted interest." *Id.* (cleaned up).

53.    Urging supporters, donors, and members of the public to contact their public officials to influence legislative or other government activity is protected speech under the First Amendment.

54.    Plaintiffs frequently engage in grassroots advocacy that urges like-minded individuals to contact their elected officials and share their opinions about pending legislation or other matters for the purpose of influencing government activity. Plaintiffs wish to communicate freely with supporters, donors, and members of the public who are not public officials about issues that matter to Plaintiffs without having to report to the government how much money they spend on such communications. Every time Plaintiffs report expenditures or other information about their protected speech, Plaintiffs increase the probability that activists or other individuals who

disagree with them on matters of policy will target them (or anyone associated with Plaintiffs) for harassment and intimidation.

55.    It is also costly and time consuming for Plaintiffs to track and categorize their expenditures to account for every communication they have with supporters that qualifies as grassroots advocacy.

56.    Minnesota's law requiring principals to disclose information about grassroots advocacy violates the First Amendment because the state lacks a sufficiently important interest in requiring such disclosures, and even if it did have such an interest, the law is not narrowly tailored to advancing any interest.

57.    The law also burdens Plaintiffs' ability to engage in constitutionally protected speech, including anonymous speech, by imposing costs on Plaintiffs and exposing them to potential harassment.

58.    By enforcing the grassroots advocacy laws, Defendants, under color of law, deprive Plaintiffs of their right to freedom of speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and are entitled to damages, declaratory relief, a temporary restraining order, a preliminary and permanent injunction against continued enforcement and maintenance of Defendants' unconstitutional law, and attorney fees and expenses under 42 U.S.C. § 1988.

COUNT TWO
RIGHT TO FREE SPEECH, U.S. CONST. AMENDS. I, XIV – 42 U.S.C. § 1983
FACIAL AND AS-APPLIED CHALLENGE TO THE VENDOR-DISCLOSURE LAW

59.    The plaintiffs reallege and incorporate by reference paragraphs 1 through 58.

60.    Minnesota compels advocacy organizations like Plaintiffs to publicly identify their vendors whenever they spend more than $2,000 on paid advertising "urging members of the public to contact public or local officials to influence official actions." Minn. Stat. § 10A.04 subd. 6(d). Plaintiffs regularly pay for advertising that fits this description, as direct mail advertising almost always requires vendor costs higher than $2,000. In 2024, MGR met this threshold at least eight times, and MNRTL met it at least 12 times.

61.    Minnesota's vendor-disclosure law fails exacting scrutiny and thus violates the First Amendment because the state lacks a sufficiently important interest in requiring public disclosure of the vendors utilized by people like Plaintiffs to urge others to contact their public officials about government action. And even if such disclosure did further an important interest, it is not narrowly tailored to meet that goal.

62.    In addition to serving no permissible purpose, the vendor-disclosure law burdens Plaintiffs' right to speak by requiring them to disclose their private associations as a condition of engaging in their desired advocacy. Considering the risk of harassment and retaliation it occasions, such

20

disclosure requirements make it more difficult for Plaintiffs to find vendors willing to work with them, and it causes Plaintiffs to incur additional costs. All this makes Plaintiffs' advocacy more difficult and more expensive, thus burdening their ability to engage in protected speech about matters of public policy.

63.   By enforcing the vendor-disclosure law, Defendants, under color of law, deprive Plaintiffs of their right to freedom of speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and are entitled to damages, declaratory relief, a temporary restraining order, a preliminary and permanent injunction against continued enforcement and maintenance of Defendants' unconstitutional law, and attorney fees and expenses under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs ask that judgment be entered in their favor and against Defendants as follows:

A.   A declaration that the vendor-disclosure law in Minn. Stat. § 10A.04 subd. (6)(d), and the grassroots advocacy disclosure laws requiring Plaintiffs to report any information about advocacy urging others to contact public officials to influence legislative or other government activity, violate the First Amendment both facially and as-applied against Plaintiffs;

21

B.    Preliminary and permanent injunctive relief barring Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the vendor-disclosure law in Minn. Stat. § 10A.04 subd. (6)(d) or the grassroots advocacy disclosure laws requiring Plaintiffs to report any information about advocacy urging others to contact public officials to influence legislative or other government activity;

C.    Nominal damages in the amount of $17.91;

D.    Costs and attorneys' fees under 42 U.S.C. § 1988; and

E.    Any other relief this Court may grant in its discretion.

Dated: June 13, 2025                Respectfully submitted,

/s/ Lee U. McGrath
Lee U. McGrath (MN #0341502)        Brett R. Nolan*
1300 Yale Place                     INSTITUTE FOR FREE SPEECH
Minneapolis, MN 55403-2163          1150 Connecticut Ave., NW, Suite 8
(612) 963-0296                      Washington, D.C. 20036
leeumcgrath@outlook.com             (202) 301-3300
                                    bnolan@ifs.org

                                    *pro hac application forthcoming

                                    Counsel for Plaintiffs