## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Minnesota Right to Life and        Case No. 25-CV-02476 (NEB/DTS)
Minnesota Gun Rights,

Plaintiffs,

v.                                                            **STATE DEFENDANTS'**
                                                    **MEMORANDUM OPPOSING**
Faris Rashid, et al.,                       **PRELIMINARY INJUNCTION**

Defendants.

To promote transparency in public officials' decision making, Minnesota requires entities that engage in grassroots lobbying ("principals") to disclose information about their lobbying activities. In particular, principals must disclose the identity of their advertising vendors when they spend more than $2,000 for an advertising campaign to encourage members of the public to lobby public officials. Plaintiffs Minnesota Right to Life and Minnesota Gun Rights seek to enjoin Defendants—members and staff of the Minnesota Campaign Finance and Public Disclosure Board—from enforcing this disclosure requirement. The Court should deny this motion. The injuries that Plaintiffs allege stem from third-party conduct, not from the disclosure requirement. Moreover, the vendor disclosure requirement satisfies the First Amendment because it is narrowly tailored to further Minnesota's important interest in members of the public knowing the identity of those who attempt to influence them. Plaintiffs have also failed to establish a risk of irreparable harm: even if the law is enforced, they will suffer no adverse consequences before their First Amendment arguments are adjudicated. And finally, Plaintiffs' delay in bringing suit undermines any claim of urgent or irreparable injury.

## FACTS

As a part of a larger effort to modernize the state's lobbying laws in 2023, Minnesota added a requirement that entities must disclose paid advertisements that encourage others to influence their government officials. 2023 Minn. Laws ch. 62, art. 5, § 17 (codified at Minn. Stat. § 10A.04, subd. 6(d) (2024)); (Sigurdson Decl. ¶ 2). But this requirement applies only when the entity spends more than $2,000 and intends to urge members of the public to contact public or local officials to influence official actions. Minn. Stat. § 10A.04, subd. 6(d).

The law does not limit who entities can do business with. Rather, the entity must report the date of purchase, the vendor's name and address, a description of the advertising, and any specific subjects of interest addressed by the advertisement. *Id*. These reports are filed annually and must cover advertising purchased for the preceding calendar year. *Id.*, subd. 6(a). The law was effective for all advertisements purchased on or after January 1, 2024, which had to be reported by March 17, 2025. 2023 Minn. Laws ch. 62, art. 5, § 17.

This disclosure requirement has myriad benefits. An organization's choice of vendor can reveal the scope, scale, funding, or professionalization of an advocacy campaign. (Sigurdson Decl. ¶ 8.) It can also help uncover coordinated efforts by multiple entities using the same vendor to advance related messaging. (*Id*. ¶ 9.) This information, in turn, helps expose potential "astroturf" campaigns: efforts that appear organic but are actually orchestrated by interest groups. (*Id*. ¶ 6.) This is important for both the general public and public officials in determining the weight to give supposed grassroots lobbying efforts. (*Id.*)

2

The disclosures also help the electorate better evaluate the sources and influences behind advocacy efforts. They enable Minnesotans to know, for example, what organization is behind a mailer encouraging them to contact a representative about voting a certain way on bill. (*Id*. ¶ 7.) Moreover, based on knowing the vendors used, members of the public are better able to uncover whether a principal is broadly seeking public support or instead targeting specific audiences. (*Id*. ¶ 11.)

Finally, vendor disclosures can help the public gauge whether advertising vendors are attempting to shape public discourse. By allowing Minnesotans to know which vendors were used for particular campaigns, the disclosure requirement allows the public to know if the same vendor charged different rates for similarly scoped campaigns. (*Id.* ¶ 10.)

Plaintiffs are two advocacy organizations that allege they purchased at least twenty advertisements in 2024 that are subject to the reporting requirement. (Doc. 9, ¶¶ 3–4, 18.) This included sending direct mail advertisements on or before May 19, 2024. *See* (*id.* ¶ 18 (stating mailings were sent about "pending legislation")); Minn. Const. art. IV, § 12 (requiring 2024 legislative session to end on May 19, 2024). As such, these expenditures qualify for reporting in 2025.

Despite triggering the reporting requirement over a year ago, Plaintiffs waited until late June 2025 to seek an "emergency" preliminary injunction. (Doc. 7.) Plaintiffs allege that the vendor disclosure requirement constitutes compelled speech that violates their First Amendment rights. (Doc. 1, ¶¶ 59–63.) They bring both facial and as-applied challenges against the members and employees of the Board, as well as three county attorneys. (*Id.* ¶¶

6–15.) Plaintiffs seek a permanent injunction prohibiting enforcement of the disclosure requirement, along with a declaratory judgment. (*Id.* at 21–22.)

Plaintiffs presently seek a preliminary injunction solely against the vendor disclosure requirement. Although they challenge the requirement to disclose *advertising* vendors, the only example Plaintiffs provide is of a vendor terminating a contract involves a *mailbox* vendor that would not be subject to disclosure under the statute. (Doc. 9, ¶ 13.) They also allege a nondescript and unsuccessful attempt by third-parties to pressure a member outreach vendor to cancel service. (*Id.*, ¶ 14.) Plaintiffs do not allege that this vendor's contract would have triggered the disclosure requirement. (*Id.*)

## ARGUMENT

A preliminary injunction is an extraordinary remedy, and the burden of establishing its propriety is on the movant. *Ng v. Bd. of Regents of Univ. of Minn.*, 64 F.4th 992, 997 (8th Cir. 2023). When evaluating a request for preliminary relief, courts consider four factors: (1) whether the movant will suffer irreparable harm without an injunction; (2) the balance of harms between the parties; (3) the movant's likelihood of success on the merits; and (4) the public interest. *Id*. No single factor is dispositive; the court must weigh all four when determining whether to issue an injunction. *Id.*

Here, no factor supports injunctive relief. Plaintiffs are unlikely to succeed on the merits because they lack standing and their First Amendment claims are without merit. They have also failed to show irreparable harm, and both the equities and public interest favor Minnesota.

I.    **PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.**

The Court should deny preliminary relief because Plaintiffs are unlikely to succeed on the merits. Plaintiffs lack standing, and even if this were not the case, their First Amendment claim is without merit because the vendor disclosure requirement is narrowly tailored to further Minnesota's important interest in members of the public knowing who is attempting to influence them to advocate to public officials.

A.    **Plaintiffs Lack Standing Because Their Injuries Are Caused by Third Parties.**

Plaintiffs cannot prevail on the merits because they lack standing to assert their claims. Although standing requirements are somewhat relaxed in the First Amendment context, Plaintiffs still bear the burden of establishing a concrete and particularized injury, a causal connection between the injury and the challenged conduct, and a likelihood that a favorable court decision will redress the injury. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793–94 (8th Cir. 2016).

Here, Plaintiffs' admissions defeat their ability to establish standing. The injuries they allege are traceable to the actions of third parties—not the disclosure requirement— and a favorable decision would not redress those injuries.

1.    **Plaintiffs' injuries fail the traceability requirement because they arise from third parties.**

Plaintiffs assert that the disclosure requirement forces them to "chang[e] how they communicate"—specifically, by avoiding advertising expenses that trigger reporting obligations, and instead engaging in less and different speech than they would otherwise choose. (Doc. 8, at 11.) They believe that disclosure could cause their vendors to face

harassment and be discouraged from working with them. (*Id.* 10–11.) But Plaintiffs admit that any alleged injury comes from the conduct of third parties, not from any action by Defendants.

For an injury to be "fairly traceable" to a defendant's conduct, the plaintiff must show "a causal connection between the injury and the conduct complained of that is not the result of the independent action of some third party not before the court." *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017). In evaluating traceability, a court may not ignore the context of the alleged injury. *See, e.g.*, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 458 (8th Cir. 2010) (considering "practical reality of the market" when considering claims about stock devaluation, as "gains or losses on particular sales could be caused by endless different market factors"). Nor may a court attribute responsibility to a defendant for the actions of individuals or entities over which the defendant has no control. *See Muff v. Wells Fargo Bank NA*, 71 F.4th 1094, 1100–01 (8th Cir. 2023) (holding injury of lost funds from bank account not traceable to Wells Fargo, which "had no control over the money in those accounts").

Here, Plaintiffs admit that third parties have independently identified their vendors for at least five years, well before Minnesota required disclosure under the statute at issue here. (Doc. 8, at 9–10; Doc. 9, ¶¶ 13–15).) For example, even without the vendor disclosure requirement, "activists discovered" a vendor used by Plaintiff Right to Life in 2020. (*Id.*) These individuals also located the vendor's contact information and address. (*Id.* (noting that activists "call[ed] the vendor and show[ed] up at its store").) Plaintiffs further vaguely

claim that other individuals have identified several of their vendors in the years preceding this lawsuit. (*Id.*)

The critical takeaway from these admissions is not, as Plaintiffs urge, that their vendors were discovered by activists. Rather, these admissions establish that third parties were able to locate information about Plaintiffs' vendors without access to any of the information required by the current disclosure provision, including enough information to cause vendors to sever ties with Plaintiffs. (*Id.*) That these actions were possible before the vendor disclosure requirement existed confirms that any risk faced by Plaintiffs' vendors stems from the conduct of third parties, not from the Board or the disclosure requirement itself. Relatedly, many of the downstream consequences from the vendors' decision to sever ties are the product of their contractual relationships with Plaintiffs, not injuries due to vendor disclosure requirement. Plaintiffs do not allege, and cannot establish, that the Board has any control over these third parties. Accordingly, Plaintiffs' injuries are not fairly traceable to the Board, which does not direct or influence the conduct that gives rise to the alleged harm. *Cf. Muff*, 71 F.4th at 1100–01.

Plaintiffs argue that more disclosure may elevate the risk of the threats resulting from improper pushback and counterspeech. (Doc. 8, at 10-12.) But Plaintiffs themselves concede that they engage in work that requires them to speak on topics they describe as "controversial," and that pushback and counterspeech discouraging others from doing business with them is "expected."[1] (Doc. 8, at 8.)-Plaintiffs' request for the Court to ignore

---

[1] The Board, of course, does not condone criminal threats against anyone.

this context, which *Brown* requires the Court to consider, omits the essential element of traceability from Plaintiffs' standing burden. 628 F.3d at 458. To this point, Plaintiffs admit that they were concerned about vendor privacy well before this lawsuit, due to prior incidents of harassment. (Doc. 8, at 11 (citing Doc. 9, at 16–18).) This admission confirms that their alleged speech-related injuries stem from the harassment itself, rather than the disclosure requirement or its enforcement by the Board.

Finally, Plaintiffs place considerable reliance on *Dakotans for Health v. Noem*, 52 F.4th 381 (8th Cir. 2022), to bolster their standing arguments. (Doc. 8, at 14.) But *Dakotans* is readily distinguishable. In that case, an advocacy group that hired paid circulators (who were natural persons) challenged a law that regulated the circulators. *Id.* at 385. Central to the court's standing determination was the conclusion that the statute would limit the pool of people to carry the group's message because it required circulators to disclose "sensitive personal information" including a home address, email address, phone number, prior home address, and sex offender status. *Id.* at 387. This would make it significantly easier for others to harass the paid circulators. *Id.* at 386. Minnesota, in contrast, requires principals to report only the name and address of their vendors; information which, as part of forming the advertising business, is already publicly available. Given the narrower scope of Minnesota's disclosure relative to the disclosures in *Dakotans*, it is far from clear whether Minnesota's statute will "limit[] the pool of" vendors. *Id.* at 387. Instead, vendor action depends on the unknown conduct of third parties. And without that connection, Plaintiffs lack standing.

**2.    Because Plaintiffs' injuries are not traceable to the Board, injunctive relief cannot redress those injuries.**

Because Plaintiffs' injuries are not traceable to the Board, they are likewise not redressable by a favorable court decision.

In a standing analysis, causation and redressability are usually "flip sides of the same coin." *Diamond Alt. Energy, LLC v. Env't Prot. Agency*, 145 S. Ct. 2121, 2133 (2025). Typically, there is "little question" about redressability when a plaintiff challenges a law that applies to them. *Id.* at 2134. But a plaintiff's task becomes more difficult when, as here, the claimed injury depends on the anticipated conduct of third parties. *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (analyzing injuries that were anticipatory and "one-step-removed" from the defendants' conduct). In such cases, "past injuries are relevant only for their predictive value." *Id.* at 59. Courts should be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 57 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)). Accordingly, when a plaintiff cannot link a past injury to the defendant, it becomes "much harder" to establish that any risk of any future injury is traceable to that defendant, and thus redressable by the court. *Id.* at 59.

Plaintiffs have provided no evidence linking the past harassment their vendors experienced to either the Board or the vendor disclosure requirement. Nor could they: the cited incidents predate the enactment of the disclosure provision. (Doc. 8, at 9-10 (citing Doc. 9, at ¶¶ 13–15).) Past events are "relevant only insofar as [they are] a launching pad for a showing of imminent future injury." *Murthy*, 603 U.S. at 59. But nothing about the

events Plaintiffs allege bears any connection to the Board or the challenged statute. For that reason, Plaintiffs have failed to show that any relief this Court could provide would redress their injuries. Their allegations about past events are, as to standing, a launching pad to nowhere.

The Supreme Court's decision in *Murthy* is instructive on this issue. There, the plaintiff states and social media users alleged that some of their posts had been removed or demoted on social media platforms in violation of the First Amendment. 603 U.S. at 53. Rather than suing the platforms directly, the plaintiffs sued various federal officials, alleging that the government had "pressured" the platforms to censor their content. *Id.* at 54. On appeal from the grant of a preliminary injunction, the Court concluded that no plaintiff had standing because they failed to show that any past censorship was likely traceable to the government. *Id.* at 68. The record instead showed that the platforms had "independent incentives to moderate content and often exercised their own judgment." *Id.* at 60.

Here, Plaintiffs similarly do not allege any connection between Defendants and the individuals who have contacted their vendors. The reports are simply made available to the public. *See id.* at 62 (concluding that "events of the past do little to help any of the plaintiffs" when those past events were not linked to defendants' conduct). Just as it was "no more than conjecture" for the Supreme Court to assume that the *Murthy* plaintiffs would face government-induced censorship, it is equally speculative to conclude that the vendor disclosure provision will influence the behavior of past or potential advocates against Plaintiffs. *Id.* at 72 (finding no standing when plaintiffs could only speculate about

future decisions of third parties). This conclusion is reinforced by Plaintiffs' own admission that their supposed injuries predated the existence of the disclosure requirement. *See id.* at 68–69 (noting that evidence of injury predating any involvement by defendants "weakens the inference" that subsequent injuries were traceable to them).

Plaintiffs' failure to establish traceability precludes any showing of redressability. These two elements of standing generally rise and fall together, so Plaintiffs' inability to meet their burden on traceability supports the conclusion that redressability is also lacking. *Cf. Diamond Alt. Energy*, 145 S. Ct. at 2133. In any event, the speculative role of third parties in Plaintiffs' theory of harm—namely, the past and potential opponents about whom they express concern—further undermines any possibility of redressability. *See Murthy*, 603 U.S. at 57 (noting heightened difficulty of establishing redressability when alleged injuries turn on actions of third parties, in context of motion for preliminary injunction involving First Amendment claims).

In short, Plaintiffs have not shown that their alleged injuries are fairly traceable to the Board or the vendor disclosure requirement, nor have they demonstrated that those injuries could be redressed by an injunction. Their asserted harms stem from independent actions by third parties, not from any conduct by Defendants. Because Plaintiffs cannot satisfy these core elements of standing, their claims are unlikely to succeed; more than that, they are jurisdictionally barred.[2]

---

[2] Plaintiffs mention the statute's vagueness in passing, but do not develop any argument that the statute void for vagueness. (Doc. 8, at 12.) By failing to develop this argument, they have forfeited it. *InfoDeli, LLC v. Robidoux, Inc.*, 136 F.4th 792, 802 n.8 (8th Cir. 2025). Moreover, the statute's meaning is readily determined by dictionary definitions to

### B.    The Vendor Disclosure Requirement Is Constitutional.

Even if Plaintiffs had standing, their First Amendment claim fails on the merits. State statutes are presumed constitutional, and Plaintiffs have the burden to show otherwise. *Branson v. O.F. Mossberg & Sons, Inc.*, 221 F.3d 1064, 1065 n.4 (8th Cir. 2000). Plaintiffs challenge a disclosure requirement. And the Supreme Court has long recognized that such requirements are constitutional as "a less restrictive alternative to more comprehensive regulations of speech" because, although they may impose some burden, they "do not prevent anyone from speaking." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 366, 369 (2010) (striking down limit on making election communications but upholding associated disclosure requirement). As a result, disclosure requirements like Minnesota's are subject only to "exacting" scrutiny. *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010). This standard requires a substantial relation between the disclosure requirement and a sufficiently important government interest. *Id.* A statute satisfies exacting scrutiny when the strength of the government's interest reflects the seriousness of the burden on First Amendment rights and the requirement is narrowly tailored to serve that interest. *Id.*; *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021).

Minnesota's vendor disclosure requirement satisfies that standard because it advances the important government interests of promoting transparency and fostering accountability, and it does so in a manner proportionate to those ends.

---

the extent Plaintiffs have any confusion. *See, e.g.*, *Disbursement*, DICTIONARY.COM (last visited July 17, 2025) ("money paid out or spent").

**1.    Minnesota has an important interest in the disclosure of vendor expenditures made to encourage grassroots lobbying.**

Minnesota has a significant interest in identifying those who seek to influence its legislators. *United States v. Harriss*, 347 U.S. 612, 625 (1954). That interest extends to knowing who is attempting to influence legislative outcomes through grassroots lobbying efforts. *Id.* at 513. *Minn. State Ethical Pracs. Bd. v. Nat'l Rifle Ass'n of Am.*, 761 F.2d 509, 512–13 (8th Cir. 1985). Requiring disclosure of vendors involved in distributing or amplifying paid grassroots messages helps ensure that both the public and lawmakers understand the sources behind mass influence campaigns. As the Supreme Court has explained, "the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate" the "myriad pressures to which [representatives] are regularly subjected." *Harriss*, 347 U.S. at 625. This interest becomes especially important when, as here, there is concern that ostensibly grassroots lobbying may in fact reflect an "artificially simulated" campaign. *Ethical Pracs. Bd.*, 761 F.2d at 512.

Contrary to Plaintiffs' characterization, vendor information is not irrelevant. (Doc. 8, at 15–16.) Knowledge of vendor choice can reveal the scope, scale, funding, or professionalization of a campaign, providing a fuller picture of how organized and sustained the effort is. (Sigurdson Decl. ¶ 8.) This, in turn, helps expose potentially artificially stimulated campaigns. (*Id.* ¶ 6.) By requiring disclosure, Minnesota's statute advances the important governmental interest in preventing deception and distortion in the legislative process.

### 2.    A substantial fit exists between Minnesota's interest and the vendor disclosure requirement.

The vendor disclosure requirement bears a substantial relationship to Minnesota's important interest in transparency. Disclosure may be justified by the government's interest in providing the electorate with information about the sources of election-related spending. *Citizens United*, 558 U.S. at 367. Contrary to Plaintiffs' argument, requiring disclosure of specific vendors—rather than simply reporting that an unspecified amount was spent on advertising—meaningfully advances that interest in at least five ways.

First, vendor information can shed light on coordinated efforts by multiple entities to advance related messaging. (Sigurdson Decl. ¶ 9.) Disclosure enables both the public and public officials to detect patterns in advocacy that would otherwise remain hidden. (*Id.* ¶¶ 6–8.) Courts have recognized this as a valid and compelling interest. *See Citizens United*, 558 U.S. at 367.

Second, vendor disclosures help the electorate better evaluate the sources and influence behind advocacy efforts, beyond merely revealing that a principal spent money on advertising. The Ninth Circuit recently upheld a similar disclosure regime in *No on E v. Chiu*, 85 F.4th 493 (9th Cir. 2023), where a political committee challenged a requirement to disclose "secondary contributors"—that is, contributors to the committee's donors. *Id.* at 498. The court rejected the challenge, explaining that "providing information to the electorate may require looking beyond the named organization that runs the advertisement." *Id.* at 505. Giving the public access to this additional information, the court reasoned, helps it to "pick out meaningful and accurate messages." *Id.* Vendor disclosure

serves a similar function here. It enables the public to connect the content of an advertisement with the principal responsible for it. (Sigurdson Decl. ¶ 7) For example, if a member of the public sees a message on a Billboards, Inc. billboard, the vendor disclosure reports can reveal which organization paid Billboards, Inc., to run the ad. *Hearing Before the S. Elections Comm.*, at 1:14:15–:40, 2023 Minn. Leg., 93rd Sess. (Minn. Feb. 28, 2023) (testimony of Jeff Sigurdson, Exec. Dir. of Minn. Campaign Fin. & Pub. Disclosure Bd.). Without that requirement, individuals would be unable to make such connections and thus unable to understand who is attempting to influence them. (Sigurdson Decl. ¶ 7.)

Third, vendor disclosures support informed public discourse by adding context to the advocacy ecosystem. (*Id*. ¶ 7.) Just as individuals may be influenced by knowing that a particular donor supports a candidate or cause, they may interpret advocacy differently when they learn it was produced by a firm with well-known ties to specific ideologies or political movements. Vendor identity, in this way, contributes to the public's ability to assess the credibility, intent, and affiliations behind political messaging.

Fourth, vendor disclosure allows the public to assess whether vendors themselves are shaping the political landscape by favoring or disadvantaging particular grassroots campaigns. (*Id*. ¶ 10.) By requiring principals to disclose the identity of their vendors and the amounts paid, the law allows the public to compare expenditures across campaigns. If two principals engage the same vendor for similar messaging but are charged significantly different amounts, the disparity may suggest an attempt by the vendor to influence political discourse. Disclosure empowers individuals to recognize and weigh that influence when evaluating messages delivered through those vendors.

Fifth, vendor disclosure allows the public to assess whether a principal is broadly seeking public support or engaging in a targeted astroturf campaign. (*Id*. ¶ 11.) The identity of a vendor can reveal whether a campaign is directed at, for example, radio listeners, TikTok users, or Truth Social users, each of which is a distinct demographic. (*Id*.) Knowing who is being targeted, and through what medium, gives individuals greater context for evaluating the message and deciding how to respond. *Cf. Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1008 (9th Cir. 2010) ("An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another.").

### 3.    The vendor disclosure requirement Is narrowly tailored.

The vendor disclosure requirement is also narrowly tailored to serve Minnesota's interests. Narrow tailoring requires a fit between the government's interest and the means chosen to achieve it. *Brown v. Plata*, 563 U.S. 493, 531 (2011). In the context of disclosure laws, however, it "does not require that disclosure regimes be the least restrictive means of achieving their ends." *Bonta*, 594 U.S. at 608. The vendor disclosure requirement satisfies this standard by directly advancing the state's transparency, anti-circumvention, and accountability interests through targeted, proportionate means.

The disclosure requirement applies only to expenditures over $2,000, targets paid advertising intended to mobilize the public to contact officials, and focuses solely on reportable transactions—not internal membership or associational information. This structure ensures that the requirement reaches only substantial and public-facing lobbying efforts while minimizing incidental burdens on smaller-scale advocacy. Far from being

16

overbroad or underinclusive, the statute reflects a constitutionally appropriate balance between transparency and privacy.

Plaintiffs contend that the vendor disclosure requirement is not narrowly tailored because it is underinclusive because it does not apply to media outlets. (Doc. 8, at 17.) But this reflects a permissible legislative judgment designed to avoid chilling the press. The press holds a "special and constitutionally recognized role . . . in informing and educating the public, offering criticism, and providing a forum for discussion and debate." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 781 (1978). Indeed, the First Amendment expressly protects the freedom of the press. U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom . . . of the press . . . ."). The statute's media exception simply reflects this longstanding constitutional safeguard.

Nor does the media exception undermine the substantial relationship between the vendor disclosure requirement and the state's interests. The Minnesota Legislature is not required to "address all aspects of a problem in one fell swoop." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 70 (2025). Even if more (or other) disclosures could support Minnesota's interests even more than the present ones, the disclosure regime still meaningfully serves its objectives in cases like Plaintiffs', where private organizations spend thousands of dollars to influence legislation through public mobilization.

Plaintiffs also attempt to defeat narrow tailoring by analogizing their speech to a *Star Tribune* podcast wherein a guest encourages listeners to contact their legislators. (Doc. 8, at 18.) This analogy falls flat because it rests on the mistaken premise that the same podcast would be exempt from disclosure if published by a news organization like the *Star*

17

*Tribune* but not if distributed by Plaintiffs. If the podcast truly conveys "the same message," then its status as a news medium, or not, would apply equally to both entities. But in reality, the messages will likely differ. When the *Star Tribune* produces a podcast, it is reporting on the speech of others. But if Plaintiffs were to produce a podcast, it would be making its own speech. Accordingly, Plaintiffs' analogy is inapplicable.

Finally, Plaintiffs' analogy also fails because news organizations are rarely anonymous. If the *Star Tribune* produced a podcast that included a guest calling for grassroots action, it is highly unlikely that the *Star Tribune* would not identify itself as the producer at some point in the podcast. The same is true for other forms of news media. Accordingly, the statute's focus on non-news entities is well tailored, as those are the actors more likely to exert anonymous pressure on legislators and the public—one of the core concerns the disclosure requirement is designed to address.

In sum, the vendor disclosure requirement readily satisfies exacting scrutiny. It advances important governmental interests in transparency, anti-circumvention, and accountability, and it does so through a narrowly tailored framework that imposes minimal burdens on expressive activity. Plaintiffs' attempts to reframe the statute as underinclusive misstate its scope and ignore the care with which it targets only substantial, public-facing advocacy. Even if Plaintiffs had standing, their First Amendment challenge would fail on the merits.

## II. PLAINTIFFS ARE NOT AT RISK OF IRREPARABLE HARM.

To justify the extraordinary remedy of a preliminary injunction, Plaintiffs must show that the harm they face is "certain and great and of such imminence that there is a

clear and present need for equitable relief." *Beber v. NavSav Holdings, LLC*, 140 F.4th 453, 461 (8th Cir. 2025) (quotation omitted). A failure to establish a likelihood of irreparable harm is, by itself, sufficient to deny injunctive relief. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Plaintiffs barely engage with this factor, asserting without any supporting reasoning that because the case implicates the First Amendment, irreparable harm necessarily follows. (Doc. 8, at 19–20.) But unlike cases where a statute allegedly stifles speech, the vendor disclosure requirement compels speech. As result, Plaintiffs face no irreparable harm from having to litigate potential enforcement proceedings because they remain free to refrain from speaking throughout those proceedings. In any event, their unreasonable delay in seeking injunctive relief further undermines any claim of irreparable injury.

### A.     Even Without an Injunction, Plaintiffs Will Have the Opportunity to Determine the Statute's Constitutionality Before Incurring Any Injury.

Unlike laws that prohibit speech, the statute Plaintiffs challenge compels it. It does not stifle their speech but instead requires disclosure of information they would prefer to keep private. Even without an injunction, however, Plaintiffs may decline to speak while asserting their First Amendment defenses in any enforcement action the Board might initiate. There is therefore no need to enjoin enforcement of the statute.

Minnesota's disclosure law does not impose automatic penalties. Before any fine can be imposed, Plaintiffs are entitled appear before the Board and submit written statements asserting their First Amendment defenses. Minn. Stat. § 10A.022, subds. 3-4 (2024). If Plaintiffs disagree with any penalty imposed by the Board, they can appeal and

raise their First Amendment defenses before the Minnesota Court of Appeals and, if necessary, eventually seek review by the Minnesota Supreme Court or the United States Supreme Court. Minn. Stat. § 606.01 (2024); *In re Haymes*, 444 N.W.2d 257, 259 (Minn. 1989); *see also Marohn v. Minn. Bd. of Architecture, Eng'g, Land Surveying, Landscape Architecture, Geoscience & Interior Design*, No. 21-CV-1241, 2021 WL 5868194, at *4 (D. Minn. Dec. 10, 2021) (recognizing Minnesota's judicial processes provides sufficient opportunity to raise First Amendment defenses).

In these circumstances, there is no "certain" or "imminent" injury. Plaintiffs "will have an opportunity to make their constitutional arguments at any enforcement proceeding before they are subjected to any injunction or penalty." *S. Pines Assocs. ex rel. Goldmeier v. United States*, 912 F.2d 713, 717 (4th Cir. 1990) (affirming denial of temporary restraining order).

In sum, because Plaintiffs have ample opportunity to raise and vindicate their constitutional objections through the orderly enforcement process before they have to pay any penalty, they cannot demonstrate the kind of immediate and irreparable harm that would justify a preliminary injunction.

**B.    Plaintiffs' Delay Demonstrates the Lack of Irreparable Injury.**

A plaintiff must act with reasonable diligence to establish irreparable harm. *Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 17 F.4th 793, 805-06 (8th Cir. 2021) (affirming no irreparable harm existed when plaintiff waited a year to challenge new policy); *see also Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894 (8th Cir. 2024); *Minn. State Coll. Student Assoc., Inc. v. Cowles*, 620 F. Supp. 3d

835, 855 (D. Minn. 2022). Here, Plaintiffs waited more than two years after the vendor disclosure requirement was enacted—and over a year and a half after it became effective—before filing this lawsuit. That delay strongly undermines their claim of irreparable harm.

Even after recognizing that the statute would apply to them, Plaintiffs admit that they took affirmative steps to trigger its reporting requirements without first, or even promptly, seeking court relief. (Doc. 8, at 11.) They now assert that the vendor disclosure requirement will compel them to "avoid advertising expenses that would require them to disclose their vendors." (*Id*.) But sworn declarations establish that Plaintiffs actively solicited and secured vendors in early 2024. (Doc. 9, ¶ 18.) This admission forecloses any argument that, absent an injunction, Plaintiffs will be forced to refrain from "engaging in constitutionally protected conduct." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 78 F.4th 1011, 1017–18 (8th Cir. 2023).

The vendor disclosure requirement was enacted more than seven months before Plaintiffs engaged in any of the conduct at issue, yet they did not challenge the law before it took effect on January 1, 2024, or for nearly eighteen months thereafter. Even after the statute became effective, Plaintiffs engaged various vendors, despite knowing that these expenditures triggered disclosure obligations. (Doc. 9, ¶ 18.) All of this occurred well after the instances of harassment that Plaintiffs described from 2020, meaning Plaintiffs proceeded with their vendor relationships fully aware of both the disclosure requirement *and* the risks they now claim it creates. (Doc. 8, at 9–10.)

This is not reasonable diligence. Plaintiffs' decision to proceed without seeking any relief, or even clarification about their obligations, strongly suggests that they have never

regarded the potential harm from the vendor disclosure requirement as truly irreparable.[3]
*See Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) (finding
assertion of irreparable harm was "undermined" by one-year delay in bringing suit);
*Adventist Health Sys.*, 17 F.4th at 806 (finding no irreparable harm where plaintiff waited
a year to challenge policy). Had Plaintiffs viewed the threat as immediate and serious, they
would have proceeded with greater caution, seeking judicial relief earlier or at least
engaging with the Board to clarify their legal obligations.

All told, Plaintiffs' lengthy delay forecloses any claim for preliminary relief. Their
inaction signals that they do not view the vender disclosure provision as a source of
meaningful harm, let alone irreparable harm. By engaging in conduct that triggered the
law's requirements without any objection or a timely request for relief, Plaintiffs forfeited
any credible claim of urgency or irreparable injury.

### C.    Plaintiffs' Alleged Irreparable Harms Are Speculative.

A party seeking a preliminary injunction must show harm that is "certain." *H&R
Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023). Speculative harm is
insufficient. *Hotchkiss*, 115 F.4th at 894. The harms Plaintiffs identify do not meet this
standard.

---

[3] Instead, Plaintiffs appear to have started this litigation to ward off any potential
enforcement action from the Board. As is its standard practice, after Plaintiffs failed to file
their required reports, Board staff reminded them of that obligation. (Sigurdson Decl. ¶ 13.)
Rather than file the reports, Plaintiffs instead filed this lawsuit seventy-four days later.
(Doc. 1, at 22.)

The irreparable harm Plaintiffs identify is that they will lose advertising vendors if required to disclose those vendors. (Doc. 8, at 8–10.) But the only concrete example they give of a vendor terminating a contract is of a non-advertising vendor terminating mailbox access. (*Id.* at 9–10.) While Plaintiffs allege that they lost out on recruitment and donations from the loss of this mailbox, it is entirely speculative to say they will suffer similar harms from disclosing advertising vendors. Unlike the ongoing use of a mailbox, once an advertisement has been placed, posted, mailed, printed, or broadcasted, nothing remains for the advertising vendor to discontinue.

Moreover, it is entirely speculative to say that advertising vendors—as opposed to mailbox vendors—will respond to public pressures in the same way. As a matter of common sense, advertising vendors are in the business of relaying the messages of others, and are therefore less likely to terminate any business with Plaintiff in response to public advocacy as compared to a mailbox vendor that may not regularly engage in speech-related business. Indeed, although members of the public have apparently been able to determine Plaintiffs' vendors even without the vendor disclosure requirement in the past, it is telling that Plaintiffs do not identify any advertising vendor that has discontinued a contract.

Finally, Plaintiffs notably do not allege that they would be unable to find replacement vendors (or even that those vendors would be more expensive), even if existing ones were to terminate their contracts. That being the case, it is entirely speculative to suggest that Plaintiffs would face any more difficulty placing their advertisements with the vendor disclosure requirement in place than it was before its enactment.

In summary Plaintiffs' one instance of a non-advertising vendor discontinuing a contract five years ago does not establish that irreparable harm is "certain" to occur in the future. Accordingly, Plaintiffs cannot establish irreparable harm.

## III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION.

Neither the balance of the equities nor the public interest supports injunctive relief. These two factors essentially merge when a plaintiff seeks to enjoin government action. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In evaluating them, the Court must weigh the harms that arise from granting or denying an injunction, with particular attention to the broader public consequences. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

The equities and public interest decisively weigh against an injunction here. Most importantly, Plaintiffs have failed to show a likelihood of success on the merits, which is a fatal deficiency in any request for injunctive relief. *Eggers v. Evnen*, 48 F.4th 561, 566-67 (8th Cir. 2022).

Nor will Plaintiffs suffer harm absent an injunction. They remain free to hire vendors of their choice and will not be required to disclose those vendors (or face any penalty) before having an opportunity to litigate their First Amendment claims. Their own delay in seeking injunctive relief further undercuts any claim of injury. By contrast, Minnesota would suffer irreparable harm from an injunction. Indeed, when a court enjoins a state "from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012). The balance of equities and public interest thus favor the Board.

## CONCLUSION

Plaintiffs are unlikely to prevail on the merits, cannot show irreparable harm, and have not demonstrated that the balance of equities favors an injunction. The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: July 18, 2025

Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General


s/**Allen Cook Barr**
ALLEN COOK BARR (#0399094)
MADELEINE DEMEULES (#0402648)
NATHAN J. HARTSHORN (#0320602)
Assistant Attorneys General

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1487 (Voice)
(651) 297-1235 (Fax)
allen.barr@ag.state.mn.us
madeleine.demeules@ag.state.mn.us
nathan.hartshorn@ag.state.mn.us

ATTORNEYS FOR STATE DEFENDANTS

|#6111717