# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MINNESOTA RIGHT TO LIFE and
MINNESOTA GUN RIGHTS,

    Plaintiffs,

    v.

FARIS RASHID, in his official
capacity as Chair of the Minnesota
Campaign Finance and Public
Disclosure Board, *et al.*,

    Defendants.

Case No: 25-cv-02476 (NEB/DTS)

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

I. PLAINTIFFS HAVE STANDING.

    A. Plaintiffs have standing to challenge the law because it directly regulates their conduct by compelling disclosure.

Article III standing requires "(1) an injury-in-fact; (2) a causal connection between the injury and the challenged law; and (3) and a likelihood that a favorable decision will redress the injury." *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020). Plaintiffs have standing because Minnesota's law compels Plaintiffs to disclose information they otherwise would not have revealed. *See Tennessee v. EEOC*, 129 F.4th 452, 457–58 (8th Cir. 2025). That kind of direct compulsion causes a redressable injury under Article III. *Davis v. FEC*, 554 U.S. 724, 733 (2008).

"A regulated party has a concrete interest . . . in avoiding regulatory obligations above and beyond those that can be [lawfully] imposed upon

them." *Tennessee*, 129 F.4th at 457 (quotation marks omitted). Thus, when a plaintiff is the "object" of a law that compels it to do something the plaintiff "otherwise would not [do]," it's "unnecessary to consider whether the requirement caused any specific economic harms . . . or whether [the plaintiffs] face[] a credible threat of enforcement if they refuse[] to comply." *Id.* at 458. "The imposition of a regulatory burden itself causes injury." *Id.*

Here, Plaintiffs do not "voluntarily disclose the identity of [their] vendors to the public." ECF No. 9 ¶16. But Minnesota law requires them to do so. Plaintiffs are thus "the direct objects of [the challenged law], and the [law] injures [Plaintiffs] by requiring them to act contrary to their [practice]." *Tennessee*, 129 F.4th at 458. And so they have standing to seek an injunction that would "spare[] [them] from making those disclosures." *Davis*, 554 U.S. at 733.

The Board's contrary argument focuses on the wrong question.[1] It challenges Plaintiffs' standing based only on the injury caused by activists disrupting Plaintiffs' vendor relationships. ECF No. 39 at 5–8. While that injury certainly satisfies Article III as well, it's not necessary. The simple fact that Minnesota's law "force[s]" Plaintiffs "to disclose" their vendor

---

[1] For this brief, "the Board" refers to the named members and employees of the Campaign Finance and Public Disclosure Board, who are collectively represented by the Minnesota Attorney General's office.

information causes a redressable injury. *Davis*, 554 U.S. at 733; *see also Carman v. Yellen*, 112 F.4th 386, 407 (6th Cir. 2024).

B. Plaintiffs also have standing because the law chills their speech.

The Court should find that Plaintiffs also have standing because the law reasonably chills their speech. "The First Amendment standing inquiry is lenient and forgiving." *Dakotans for Health v. Noem*, 52 F.4th 381, 386 (8th Cir. 2022) (quotation marks omitted). A plaintiff has standing when it alleges that it "would like to engage in arguably protected speech, but that [it] is chilled from doing so by the existence of the statute." *Id.* (quotation marks omitted). And when "threatened enforcement implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing." *Id.* at 386.

Here, Plaintiffs reasonably fear that disclosing their vendors will lead to harassment, disrupting Plaintiffs' advocacy. So Plaintiffs must "decide whether an advertisement that costs more than $2,000 will be worth the risk from revealing [their] vendors' identities." ECF No. 9 ¶17. In some cases, that means "purchasing less expensive ads than [they] normally would." *Id.* Given Plaintiffs' history of harassment targeting both them and their vendors, this chilling effect is "objectively reasonable," which is all Article III requires. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011).

The Board counters that Plaintiffs' injury is not traceable to the law because it depends on the independent actions of third parties—activists who harass Plaintiffs and their vendors because of how controversial Plaintiffs' speech is. *See* ECF No. 39 at 5–8. But the Board fails to contend with the well-established precedent holding that plaintiffs have standing when their injuries are caused by "the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019). "Article III requires no more than *de facto* causality." *Id.* (quotation marks omitted). So when "third parties will likely react in predictable ways" to a law or regulation, and that reaction harms the plaintiff, the third parties' "independence" does not defeat standing. *Id.*

Here, the reaction is more than "predictable"—it is "inevitable." *Ams. for Prosp. Found. v. Bonta*, 594 U.S. 595, 607 (2021). That's what the Supreme Court said just four years ago. It explained that the "the deterrent effect on the exercise of First Amendment rights" is "an *inevitable* result of the government's conduct in requiring disclosure." *Id.* (emphasis added) (quotation marks omitted). That deterrent effect is the entire reason that courts apply exacting scrutiny, rather than a more lenient standard. *Id.* The Board's argument otherwise "thumbs its nose" at *AFPF. Dakotans for Health*, 52 F.4th at 390.

Nor does the Board's attempt to distinguish *Dakotans for Health* succeed. In *Dakotans for Health*, the Eighth Circuit held a ballot committee had standing to challenge a disclosure rule even though the rule did not directly regulate the committee[2] because the evidence showed that disclosure would likely lead to paid circulators getting harassed, making it harder for the plaintiff to spread its message. *Id.* at 388. The Board says *Dakotans for Health* is different because the law there required disclosing personal information that "would make it significantly easier for others to harass the paid circulators." ECF No. 39 at 8. But that's exactly the problem here. Requiring Plaintiffs to identify their vendors' names and addresses makes it "easier" to harass them—and it defies "commonsense" to argue otherwise. *See Diamond Alt. Energy, LLC v. EPA*, No. 24-7, 145 S. Ct. 2121, slip op. at 14 (2025).

None of the cases the Board cites suggests a different conclusion. In *Muff v. Wells Fargo Bank NA*, 71 F.4th 1094 (8th Cir. 2023), the Eighth Circuit made the unremarkable observation that a plaintiff cannot sue a bank for conversion related to an account held by a different bank. *Id.* at 1100–01. In *Brown v. Medtronic, Inc.*, 628 F.3d 451 (8th Cir. 2010), the Eighth Circuit

---

[2] As explained above, the Court need not address this issue because the vendor-disclosure law directly regulates Plaintiffs and compels them to take action they otherwise would not take. *See supra* at 1–3.

held that a plaintiff lacks standing to sue for investment fraud based on a drop in stock price if the plaintiff sells the stock before the fraud is revealed. *Id.* at 457–58. And in *Murthy v. Missouri*, 603 U.S. 43 (2024), the Supreme Court held that if a plaintiff's claim is based on the theory that the government is coercing third parties into acting, the plaintiff must show that the third parties would not have voluntarily acted in the same way without government interference. *Id.* 60. Those cases have nothing to do with the predictable-effects doctrine under Article III.

The Board also challenges Plaintiffs' standing on the theory that some of Plaintiffs' vendors have already been publicly identified and harassed, and so it cannot be that any future harassment is traceable to the law. ECF No. 39 at 7–8. As part of that argument, the Board contends that the identity of Plaintiffs' vendors "is already publicly available." *Id.* at 8. But of course that's not true, as it would render the entire disclosure law pointless. How can the disclosure law be necessary if the information is already public? The Board cites no evidence for this bewildering claim.

Still, "each demand for disclosure brings with it an additional risk of chill." *AFPF*, 594 U.S. at 618. So even if some of Plaintiffs' vendors are already publicly known, the additional disclosure injures Plaintiffs by making the problem worse. That's particularly true here where Minnesota publishes the

information in an online database that makes it easy for anyone to access. *See id.* at 617.

One last point on how radical the Board's position is. The Board argues that Plaintiffs lack standing because any harassment is attributable to their own controversial speech and the conduct of third parties, not the disclosure law. ECF No. 39 at 7–8. That would also have been true in the Supreme Court's landmark decision in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958). There, the NAACP's members were harassed after opening an office in Alabama to "support[] racial integration in higher education and public transportation." *AFPF*, 594 U.S. at 606. Yet instead of blaming the NAACP for its controversial speech, the Supreme Court protected it from having to disclose its members, holding that compelled disclosure "constitute[d] as effective a restraint on freedom of association as [other] forms of governmental action. *NAACP*, 357 U.S. at 462. But as the Board sees it, the NAACP's injury arose not from Alabama's effort to obtain its membership list, but from the NAACP's controversial advocacy in the Jim Crow South. That logic turns the First Amendment on its head.

II. PLAINTIFFS WILL LIKELY SUCCEED ON THEIR CLAIM THAT THE VENDOR-DISCLOSURE RULE FAILS EXACTING SCRUTINY.

On the merits, the Board defends the vendor-disclosure law as narrowly tailored to further the state's "interest in providing the electorate with

information about the sources of election-related spending." ECF No. 39 at 14. But Plaintiffs' vendors are not the "source[] of election-related spending." And Minnesota identifies no case—no decision anywhere—upholding such an expansive view of the government's interest in disclosing information about grassroots advocacy.

But first, a note on the burden. The Board argues that "Plaintiffs have the burden to show" that the law is unconstitutional. ECF No. 39 at 12 (citing *Branson v. O.F. Mossberg & Sons, Inc.*, 221 F.3d 1064, 1065 n.4 (8th Cir. 2000)). That's not quite right. "[A]lthough a duly enacted statute normally carries with it a presumption of constitutionality, when a regulation allegedly infringes on the exercise of First Amendment rights, the statute's proponent bears the burden of establishing the statute's constitutionality." *Phelps-Roper v. Koster*, 713 F.3d 942, 950 (8th Cir. 2013) (capitalization corrected). Under exacting scrutiny, that means the state must "demonstrate its need" for disclosure, *AFPF*, 594 U.S. at 613, before the court even assesses "the burdens imposed" on the plaintiff, *id.* at 611.

A. The vendor-disclosure rule does not further an important state interest.

*1. Plaintiffs' vendors are not the "sources of election-related spending."*

The Board argues that the vendor-disclosure rule "may be justified by the government's interest in providing the electorate with information about the

sources of election-related spending." ECF No. 39 at 14. But Plaintiffs'
vendors are not the "source[]" of Plaintiffs' spending.

To conclude otherwise would mean that the United States Post Office is
the "source" of speech whenever a constituent mails a letter to her
representative.[3] It would mean that FedEx is the "source" of an advertising
campaign if a speaker uses its print shop to make copies of a flyer. It would
mean that Microsoft is the "source" of a political ad if an organization
purchases an Outlook subscription for email distribution.

This not only makes no sense—it's not supported by any of the cases the
Board cites. Rather, the Board relies on decisions analyzing the government's
interest in disclosing the identity of the speaker or the people who financially
supported the speaker. *See United States v. Harriss*, 347 U.S. 612, 623–24
(1954) (requiring lobbyists to identify themselves and who pays them); *Minn.
State Ethical Practices Bd. v. Nat'l Rifle Assoc.*, 761 F.2d 509, 510 (8th Cir.
1985) (same); *Citizens United v. FEC*, 558 U.S. 310, 366–67 (2010) (discussing
the public's interest "in knowing who is speaking about a candidate shortly
before an election"); *Doe v. Reed*, 561 U.S. 186, 194–95 (2010) (allowing
disclosure of individuals who "express[] a view on a political matter when
[they] sign[] a petition"); *AFPF*, 594 U.S. at 602 (rejecting sweeping

---

[3] *See, e.g.*, Minn. Exh. 1, ECF No. 40-1 (identifying the "United States Postal
Service" as a vendor).

disclosure of donors to charitable organizations); *No on E v. Chiu*, 85 F.4th 493, 498–99 (9th Cir. 2023) (upholding disclosure of secondary contributors to ballot committees because knowing "who is speaking enables the electorate to make informed choices" (quotation marks omitted)); *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1008 (9th Cir. 2010) (explaining how a message "might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another"). But the government's interest in knowing the source behind a political message does not extend to knowing the identity of the speaker's vendors.

Since *Buckley v. Valeo*, 424 U.S. 1 (1976), courts have justified disclosing the financial source of speech on the grounds that knowing "where political campaign money comes from" can help people detect *quid pro quo* or evaluate the strength a speaker's argument. *Id.* at 66–67; *see also First Nat'l Bank of Bellotti*, 435 U.S. 765, 791–92 & n.32 (1978) (citing *Buckley*, 424 U.S. at 66–67). Under this theory, disclosure reveals potentially hidden interests behind the message, and so knowing who paid for speech "insure[s] that the voters are fully informed about the person or group who is speaking." *Citizens United*, 558 U.S. at 368.

That is the same rationale in *Harriss*—the only case in which the Supreme Court has explained the justification for lobbyist disclosures. In *Harriss*, the Court worried that legislators would get confused by lobbyists

who "masquerade[ed] as proponents of the public weal" if they could not require the lobbyists to identify who hired them. 347 U.S. at 625. But it did not greenlight sweeping disclosures based on vague notions about transparency. Rather, it limited the government's interest to knowing "who is being hired [to speak], who is putting up the money, and how much." *Id.* Third-party vendors fit none of those criteria.

The Board points to the testimony of Jeff Sirgudson—the Executive Director of the Campaign Finance and Public Disclosure Board—to defend extending *Harriss*'s informational interest to vendors. ECF No. 39 at 15. But Mr. Sigurdson's testimony does not help. He too focused on the government's interest in identifying *the speaker*, not any third-party vendors:

> So again for the first time we're going to be able to say okay, I got a mailing to me that said, you know, uh, please contact Senator Smith and tell them to vote for the bonding bill, um, what was the cost of that *and what association actually paid for that?* It's something that will now be disclosed assuming it was over $2,000.

*Hearing on S.F. 2121 before S. Comm. on Elections*, Minn. 93rd Leg. Sess., at 1:14:19–40 (Feb. 28, 2023) (testimony of J. Sigurdson) (emphasis added).[4] Whatever interest Minnesota has in publicly identifying the sources of grassroots advocacy, that interest does not apply to their vendors.

---

[4] Available at https://mnsenate.granicus.com/player/clip/10525.

11

2. *Minnesota cannot rely on speculation about tenuous connections between a vendor's identity and the source of a speaker to justify its disclosure law.*

The Board contends that identifying a speaker's vendors furthers the state's interest in identifying the speaker itself because of various connections that knowing a vendor's identity might reveal. *See* ECF No. 39 at 14–16. To this end, the Board imagines ways that people might use a vendor's identity to evaluate grassroots advocacy, each more tenuous than the next. The information may, for example, help people discover a coordinated campaign between organizations that use the same vendor. *Id.* at 14. Or it may reveal that a speaker used an ideologically motivated vendor, *id.* at 15, or that the speaker targeted a narrow audience rather than "broadly seeking public support," *id.* at 16. In some cases, the Board speculates, knowing who the vendor is will allow people to identify an anonymous speaker, or even determine whether a vendor is giving discounts to some speakers but not others. *Id.* at 14–15.

These examples all suffer the same flaw: they're based on speculation about how the information *might* in some rare circumstances *indirectly* further the state's interest in knowing the source behind grassroots advocacy—an interest already served by requiring grassroots advocates to disclose their expenditures. But the Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." *FEC v. Ted*

*Cruz for Senate*, 596 U.S. 289, 307 (2022). And laws that are only "tenuously related to the substantial interests disclosure serves . . . 'fail exacting scrutiny.'" *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876 (8th Cir. 2012).

The Supreme Court's opinion in *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999), is instructive on this point. There, Colorado enacted a law requiring ballot-initiative proponents to disclose the "names and addresses" of paid circulators, as well as "the total amount paid to each." *Id.* at 201. The Supreme Court rejected the law because it was only "tenuously related to the substantial interests disclosure serves." *Id.* at 203. Relevant here, the Supreme Court distinguished between the state's interest in identifying people who pay for circulating a ballot initiative (the speakers) and those who are paid to do the circulating (the vendors). *Id.* The state already required disclosing the former, and it had not "demonstrated" any "added benefit of revealing the names of [the latter]." *Id.*

The same is true here. Minnesota already requires Plaintiffs to disclose their own identities when spending money on grassroots advocacy. The Board thus bears the burden of "demonstrat[ing]" the "added benefit of revealing the names of [their vendors]" *Id.* Yet all the Board offers is conjecture about ways people may glean marginal context from knowing who a speaker's vendors are. It does not give even one real-world example of a coordinated

grassroots lobbying campaign that could only have been discovered by identifying common vendors. Nor does it identify one case of a vendor trying to covertly influence legislation by discounting work related to grassroots advocacy. Despite filing a copy of every single disclosure made for the year 2024, *see* Bd. Exhibit 1, ECF No. 40-1, the Board does not point to a single example that fits one of its imaginary use cases. Such tenuous and speculative claims about how the law substantially furthers the state's interest cannot "carry [the Board's] First Amendment burden." *Ted Cruz for Senate*, 596 U.S. at 307.

In fact, when Executive Director Sigurdson testified in support of this bill, a legislator asked him whether he has "had individuals or groups of people that have come concerned about what's happening." *Hearing on S.F. 2121 before S. Comm. on Elections*, Minn. 93d Leg. Sess., at 1:40:10–20 (Feb. 28, 2023) (question from Sen. B. Anderson). Mr. Sigurdson did not give any examples of complaints or concrete problems that he has encountered. Rather, he said:

> I think it kind of goes back to the idea that the Board is given a budget by the legislature to conduct disclosure that's meaningful to the public, and its evaluation of the disclosure being provided on the lobbying program is that it's not meaningful to the public, which ends up being sort of a waste of money. So it was primarily initiated by the idea that there's a better way of using these resources and providing better disclosure.

*Id.* at 1:40:42–41:15 (testimony of J. Sigurdson). A desire to efficiently spend taxpayer resources is admirable—but it's not a sufficiently important interest to compel disclosure.

Even still, the Board's hypothetical scenarios do not work. In his declaration, Executive Director Sigurdson describes a problem that he believes the disclosure rule solves. In 2024, an advocacy organization called Minnesota Citizens Concerned for Life ran an advertisement in the *Star Tribune* "asking the public to contact their legislator and advocate against the passage of an abortion referendum." ECF No. 40-1 ¶7. Sigurdson claims that someone who saw this ad "could go to the Board's website and see that Minnesota Citizens Concerned for Life was behind that advertisement and weigh the message accordingly." *Id.* But that's not actually true. The law does not require disclosing the expenditure until the next year—long after the legislative session ends and after any member of the public would need to decide how much weight to give the ad. *See* Minn. Stat. 10A.04 subd. 6(a). So the only concrete example the Board gives about how the disclosure substantially furthers the state's interest relies on a misunderstanding about how the law works.[5]

---

[5] The Board's claim that it would be "not be possible" to discover the identity of Minnesota Citizens Concerned for Life without the vendor-disclosure rule is even stranger, given that the organization publicly announced its

B. The vendor-disclosure rule is not narrowly tailored.

The Board's brief only makes the narrow tailoring problems worse. Not only does the Board fail to "demonstrate a greater need for regulation of [grassroots advocacy organizations] than for [news organizations]," *Dakotans for Health*, 52 F.4th at 390, its justification for the vendor-disclosure law reveals even more ways the law is not narrowly tailored.

1. *Minnesota's choice to exempt news organizations because it does not want to chill the press concedes the law's unconstitutionality.*

The Board justifies its news exemption because it "reflects a permissible legislative judgment designed to avoid "chilling the press." ECF No. 39 at 17. For that, the Board quotes the Supreme Court's decision in *Bellotti*, which stated that "[t]he press holds a 'special and constitutionally recognized role . . . in informing and educating the public, offering criticism, and providing a forum for discussion and debate.'" ECF No. 39 at 17 (quoting *Bellotti*, 435 U.S. at 781).

But the Board should have kept reading. *Bellotti* is an important campaign-finance case precisely because it *rejected* the government's

---

multimillion-dollar ad campaign in advance, which the *Star Tribune* reported on. *See, e.g.*, Megan Peterson, *Minnesota needs an ERA that includes gender and reproductive freedom*, Minnesota Star Tribune (May 9, 2024), https://perma.cc/9DLJ-CF4J. The Board's claim that Minnesota has an important interest in preventing anonymous grassroots advocacy through their vendors does not seem based on any real problem.

argument that it could treat the press more favorably than other organizations. 435 U.S. at 784. In fact, the very next sentence explains that "the press does not have a monopoly on either the First Amendment or the ability to enlighten." *Id.* at 782. What Minnesota calls a "permissible legislative judgment," ECF No. 39 at 17, *Bellotti* called an "impermissible" regulation "based on the identity of the interests that spokesmen may represent," 435 U.S. at 784.

That judgment is even worse here because Minnesota concedes that the vendor-disclosure law would "chill[] the press" if it applied to news organizations. ECF No. 39 at 17. Plaintiffs agree. The law's chilling effect (which the Board ignores elsewhere, *id.* at 5–8, 22–23) is why Plaintiffs need a preliminary injunction. And the First Amendment does not allow Minnesota to favor the speech rights of the press over Plaintiffs' "core political speech." *see Calzone v. Summers*, 942 F.3d 415, 425 (8th Cir. 2019) (en banc); *Dakotans for Health*, 52 F.4th at 390.

2. *The Board has failed to prove that news organizations pose less of a risk to the legislative process than other grassroots advocates.*

Minnesota next argues that it can exempt news organizations because the state "is not required to 'address all aspects of a problem in one fell swoop.'" ECF No. 39 at 17 (quoting *TikTok Inc. v. Garland*, 145 S. Ct. 57, 70 (2025). But when a state decides not to "address all aspects of a problem in one fell

swoop," it must demonstrate that it has targeted "the conduct most likely to" cause the alleged problem. *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015). A law that "evenhandedly applies" to everyone engaged in the same kind of conduct can meet this burden. *Id.* But a law that exempts similar conduct without an adequate justification cannot. *Id.* Minnesota's law falls on the wrong side of that line.

*Dakotans for Health* gives the roadmap here. There, the state enacted disclosure requirements for ballot circulators that applied only if they were paid. The Eighth Circuit held that the law was not narrowly tailored because the state failed to "demonstrate a greater need for regulation of paid circulators than for volunteers." 52 F.4th at 390. The fact that some paid circulators had their ballot signatures rejected was not enough to prove that they posed a greater risk of corruption than volunteers. *Id.* The state needed evidence to justify treating the two groups of circulators differently. *Id.*

The Board likewise offers no evidence to justify its news exemption. It half-heartedly claims that "news organizations are rarely anonymous." ECF No. 39 at 18. Perhaps that's true—although it's unclear how Minnesota knows news organizations are rarely engaging in *anonymous* speech. Still, Minnesota provides no evidence for its claim. Nor does it provide any evidence that other organizations regularly engage in anonymous grassroots advocacy, or that disclosing their vendors would solve the problem.

18

Minnesota cannot compel Plaintiffs to disclose their vendors while exempting news organizations on the hunch that revealing the identity of a graphic designer, printer, or mailbox vendor will solve an anonymity problem that might not even exist.

> 3. *The Board defends the news exemption by ignoring the statute and the Board's own advisory opinion.*

The Board denies that its law allows news organizations to distribute the same message as Plaintiffs without reporting their vendors. ECF No. 39 at 17–18. In doing so, it draws a distinction between "reporting on the speech of others" and "making its own speech." *Id.* at 18. That argument does not just ignore the law, it ignores the Board's own Advisory Opinion—an Advisory Opinion the Board fails to acknowledge in its brief.

Advisory Opinion 463 addresses whether a news organization is exempt from the lobbying laws even when "making its own speech." The Board explained that the law does not apply to a "reporter or host" who "call[s] for listeners or readers to take action . . . understanding that the petition may be the subject of a current legislative proposal or future legislation." Campaign Fin. & Pub. Disclosure Bd. Advisory Op. 463, at 3–4 (June 5, 2024), https://perma.cc/AG4G-B8U4. So a reporter can write an article about a newly proposed bill and urge readers to contact their legislators to support it without triggering the law. But if Plaintiffs send a flyer informing their

supporters about the same bill and urging them to contact their legislators to similarly support it, they must report the expenditure. *See* Minn. Stat. 10A.04 subd. 6(d). Same message—except one is delivered by a reporter, and the other is not. How the Board can square its litigation position with its own Advisory Opinion is a mystery—made worse by the fact that the Board's response ignores the Advisory Opinion entirely.

In a similar vein, the Board pushes back on Plaintiffs' hypothetical about a podcast guest engaged in grassroots lobbying, ECF No. 8 at 18, arguing that the difference is that "[w]hen the *Star Tribune* produces a podcast, it is reporting on the speech of others," while "if Plaintiffs were to produce a podcast, it would be making its own speech," ECF No. 39 at 18. But that, too, ignores the Board's Advisory Opinion, which again states that the exemption applies when a reporter or host at a news organization "express[es] sympathy or support" for a cause and "call[s] for listeners or readers to take action." Campaign Fin. & Pub. Disclosure Bd. Advisory Op. 463, at 3–4. The opinion also says the exemption applies to a reporter engaged in "[a]dvocacy/solution journalism" who "presents a clear conclusion about remedies for a social ill, including a call to action for reform or a legislative fix." *Id.* at 3–4. The Board's newly invented distinction between the news organization's own speech and reporting on the speech of others appears nowhere in the statute, and it contradicts its Advisory Opinion.

20

*4. The Board's justification for the law reveals even more narrow tailoring problems.*

Most of the Board's justification for the law focuses on how a vendor's identity might indirectly reveal other information that the state has an interest in discovering. ECF No. 39 at 14–16. But that only undermines the case for narrow tailoring because Minnesota must "demonstrate its need for [the law] in light of any less intrusive alternatives." *AFPF*, 594 U.S. at 613. In other words, Minnesota "is not free to enforce *any* disclosure regime that furthers its interest." *Id.* And it must "substantiate" the fit with evidence. *Id.* at 613–14.

Rather than substantiate the fit, the Board's witness repeatedly explains how less-intrusive alternatives would solve the problems this rule purports to address. For example, Executive Director Sigurdson explains that before the vendor-disclosure law, "there was no way for the public to know when principals were attempting to use grassroots efforts" because Minnesota does not require that organizations like Plaintiffs disclose who paid for a grassroots advertisement. ECF No. 40-1 ¶¶5–6. But if that's the problem, the narrowly tailored solution is to require disclosing the information needed to identify who paid for the advertisement—not some indirect information that

may give the public a way to discover it.[6]

All the alleged harms the Board fears fit this pattern. If Minnesota is worried about undisclosed coordination, it should enact a law tailored to disclosing coordination. If Minnesota is worried about vendors indirectly influencing legislative activity through discounted prices, it should enact a law tailored to that kind of indirect influence. And if Minnesota is worried about whether an advertising campaign is targeted at radio listeners or TikTok users, it should enact a law tailored to identifying an advertisement's distribution medium.[7] But Minnesota's choice to dox every vendor for expenditures over $2,000 because that information *may* reveal something that *indirectly* sheds light on these *speculative* problems cannot satisfy the Supreme Court's demanding standard for narrow tailoring. *See AFPF*, 594 U.S. at 613–14.

## III.    PLAINTIFFS FACE IRREPARABLE HARM.

The Board argues that Plaintiffs cannot show irreparable harm because the law does not suppress speech, because Plaintiffs' alleged delay

---

[6] Sigurdson acknowledges that there's not a single state in the country that requires such disclosure, yet he still does not identify "a single case" of grassroots advocates hiding behind anonymity in a way that identifying vendors could solve. *See Ted Cruz for Senate*, 596 U.S. at 307. The "absence of such evidence [is] significant" in assessing Minnesota's purported interest. *Id.*

[7] Of course, Minnesota would still need to prove that it's addressing real and not hypothetical problems.

22

undermines their claim, and because Plaintiffs' injuries are speculative. All three arguments are wrong.

A. The vendor-disclosure law suppresses speech by chilling future advocacy.

The Board contends that Plaintiffs' injuries are not irreparable because the law "does not stifle [Plaintiffs'] speech," and so Plaintiffs can simply wait until the Board brings an enforcement proceeding and raise its First Amendment defense in state court. That argument ignores how disclosure rules chill speech and are thus "as effective a restraint on" speech as other restrictions. *AFPF*, 594 U.S. at 606 (quoting *NAACP*, 357 U.S. at 462). Were it otherwise, no plaintiff could ever get pre-enforcement review to challenge a disclosure law.

To this end, the Board's distinction between laws that compel speech and "stifle" speech makes no sense. *See* ECF No. 39 at 19. A law that "stifle[s]" speech by—for example—banning newspapers, still requires enforcement, during which a defendant could "assert[] [its] First Amendment defenses" in state court. *Id.* Surely the Board does not contend that a newspaper would suffer no irreparable harm from the threat of enforcement so long as it can raise a First Amendment defense during whatever state enforcement proceeding may arise. The chilling effect alone constitutes a First Amendment injury, and "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury."
*Roman Cath. Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020).

The only case the Board cites for its novel argument about irreparable
harm is *Southern Pines Association v. United States*, 912 F.2d 713 (4th Cir.
1990)—a Fourth Circuit decision that does not mention irreparable harm
even once. The language the Board quotes in its brief about the plaintiffs
having "an opportunity to make their constitutional arguments at an
enforcement proceeding" comes from a discussion about the merits of a Fifth
Amendment due process claim. *Id.* at 717. It has nothing to do with
irreparable harm or even the First Amendment.

B. Plaintiffs did not delay bringing suit.

The Board next argues that Plaintiffs' claim of irreparable harm is
undermined by its supposed delay in bringing suit. They argue that this law
was enacted in 2023, governed speech in 2024, and that Plaintiffs should
have brought suit earlier to obtain a preliminary injunction. This argument
seems predicated on misunderstanding the factual record.

The Board contends that Plaintiffs triggered the reporting requirements
"[e]ven after recognizing the statute would apply to them." ECF No. 39 at 21
(citing ECF No. 8 at 11). For that, the Board cites Ben Dorr's declaration,
where he explained that both organizations made several reportable
expenditures in 2024. *Id.* (citing ECF No. 9 ¶18). But Dorr did not state

24

anywhere in his declaration that Plaintiffs knew about the amended law at that time. Nor could he have. Plaintiffs did not learn about the new requirements until 2025, when Dorr tried to file the reports for 2024. Supp. Dorr Decl., ¶2.

This fact distinguishes the cases the Board relies on. In each case, the evidence showed that Plaintiffs failed to bring suit long after learning about the problem. *See Adventist Health System/SunBelt, Inc. v. United States*, 17 F.4th 793, 805–07 (8th Cir. 2021) (more than a year); *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 894 (8th Cir. 2024) (same); *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022) (same); *Minn. State Coll. Student Ass'n v. Cowles*, 620 F. Supp. 3d 835, 855 (D. Minn. 2022) (ten months before asking for a preliminary injunction without modifying its advocacy at all). But here, Plaintiffs did not learn about the new law until spring of 2025. *See* Supp. Dorr Decl., ¶2.

Even still, Plaintiffs have not claimed that they will *never* trigger the law, and their argument that the statute chills speech does not depend on that claim. Rather, as Plaintiffs acknowledge, some advertisements might be "worth the risk" because the issue is too important, and the most effective means of advocacy is too expensive. B. Dorr Decl., ECF No. 9 ¶17. But every additional "demand for disclosure brings with it an *additional* risk of chill." *AFPF*, 594 U.S. at 618 (emphasis added). So long as the law chills some of

Plaintiffs' speech by deterring them from running some ads they otherwise would, B. Dorr Decl., ECF No. 9 ¶17, Plaintiffs suffer a First Amendment injury, *AFPF*, 594 U.S. at 618. And that First Amendment injury amounts to irreparable harm. *Roman Cath. Diocese v. Cuomo*, 141 S. Ct. at 67.

C. Plaintiffs' irreparable harm is not speculative.

The Board's final argument is that Plaintiffs' irreparable harm is speculative because it depends on the worry that "they will lose advertising vendors if required to disclose those vendors." ECF No. 39. at 23. But as with its argument about standing, the Board ignores the "inevitable" chilling effect that disclosure laws create, *AFPF*, 594 U.S. at 607—an injury the Board acknowledges when it defends the news exemption, ECF No. 39 at 17. Plaintiffs' injury does not depend on the certainty that they will lose advertising vendors. Rather, the risk that their advertisers could face harassment, which may disrupt Plaintiffs' operations, reasonably chills Plaintiffs' speech, and that's an irreparable injury happening right now. B. Dorr Decl., ECF No. 9 ¶17.

Two more quick points.

First, the Board's musing about whether "advertising vendors" might react differently to harassment than "mailbox vendors" makes no sense. The law requires disclosing "mailbox vendors" if paid as part of an advertising expenditure. Nor is that far-fetched: the Board's own evidence shows that one

organization disclosed the United States Postal Service as a vendor in 2024.
*See* ECF No. 40-1, Exhibit 1. While it's unclear what the Board even means
by an "advertising vendor," it *is* clear that the law requires disclosing any
vendor paid more than $2,000 for an expense related to a grassroots lobbying
advertisement—"mailbox vendors" included.

Second, the Board claims that Plaintiffs "do not allege that they would be
unable to find replacement vendors (or even that those vendors would be
more expensive)." ECF No. 39 at 23. Not so. Ben Dorr's declaration states
that, based on his experience in the grassroots advocacy space, vendor
harassment makes it "harder" and "more expensive" for organizations like his
to effectively spread their message. B. Dorr Decl., ECF No. 9 ¶16. And even if
replacement vendors are not more expensive, having to find a new vendor
"disrupts" Plaintiffs' advocacy. *Id.* ¶15. These fears are not speculative, and
they contribute to the chilling effect that deters Plaintiffs from engaging in
the same kind of grassroots advocacy they would without the law.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.[8]

---

[8] Plaintiffs agree with the County Attorney Defendants that, based on the
current evidence in the record stating that no county attorney has ever
enforced the statute and in which the County Attorney Defendants disclaim
any intent to enforce the statute, Plaintiffs are not entitled to a preliminary
injunction against those defendants.

Dated: August 1, 2025                    Respectfully submitted,

                                         /s/ Brett R. Nolan
Lee U. McGrath (MN #0341502)             Brett R. Nolan*
1300 Yale Place                          INSTITUTE FOR FREE SPEECH
Minneapolis, MN 55403-2163               1150 Connecticut Ave. NW
(612) 963-0296                           Suite 801
leeumcgrath@outlook.com                  Washington, D.C. 20036
                                         (202) 301-3300
                                         bnolan@ifs.org

                                         *admitted pro hac vice

                    Counsel for Plaintiffs

LOCAL RULE 7.1(F)(2) CERTIFICATE OF COMPLIANCE

I certify that the above memorandum of law complies with Local Rule 7.1(f)(1)(B) and 7.1(h)(1) because it is 6,268 words and so the cumulative word count of Plaintiffs' memorandum in support of its motion for a preliminary injunction and Plaintiffs' reply memorandum is 10,705 words, set in a 13-point proportional font, Century Schoolbook, not including the words excluded under Local Rule 7.1(f)(1)(C), as determined by the word-count function of Microsoft Word for Microsoft 365, which is set to count all text, including headings, footnotes, and quotations.

/s/ Brett R. Nolan
*Counsel for plaintiffs*