UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA RIGHT TO LIFE, ET AL., | Case No. 25-CV-02476 (NEB/DTS) |
| Plaintiffs, | |
| v. | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| FARIS RASHID, in his official capacity as Chair of the Minnesota Campaign Finance and Public Disclosure Board, ET AL., | |
| Defendants. | |

Under a Minnesota lobbying statute, plaintiff organizations Minnesota Right to Life and Minnesota Gun Rights ("Plaintiffs") must disclose the names and addresses of their advertising vendors. After suffering harassment from third-party activists, some wary vendors refused to work with Plaintiffs. As a result, Plaintiffs are reluctant to disclose vendor information, and they disagree with the requirements of the law. When Plaintiffs failed to return the required lobbying principal expenditure reports disclosing their vendors, the state Campaign Finance and Public Disclosure Board threatened to impose civil penalties.

Plaintiffs sued to prohibit civil enforcement of the statute, first seeking a temporary restraining order and preliminary injunction. (ECF No. 7.) For the reasons below, Plaintiffs' motion is granted.

## BACKGROUND

A Minnesota law requires lobbying principals (those who pay lobbyists or otherwise spend money to influence legislative action) spending more than $2,000 on advertising to disclose the names and addresses of their vendors in an itemized expenditure report. Minn. Stat. § 10A.04, subd. 6(d).[1]

Plaintiffs Minnesota Right to Life and Minnesota Gun Rights are non-profit, non-partisan organizations in Minnesota who use advertising to educate the public and legislators about their respective issues. (ECF No. 1 ("Compl.") ¶¶ 3–4.) Because grassroots advocacy falls within Minnesota's definition of lobbying—"attempting to influence legislative action . . . by communicating with or urging others to communicate with public officials or local officials"—the Plaintiffs are subject to the vendor-disclosure requirement as lobbying principals. *See* Minn. R. 4511.0100, subp. 3; Minn. Stat. § 10A.01, subd. 33; Minn. Stat. § 10A.04, subd. 6(b).

In the last few years, hostile activists have harassed both Plaintiffs and their vendors. (Compl. ¶¶ 33–34.) In one instance, Ben Dorr, the executive director of both organizations, received death threats after his home address was posted on social media.

---

[1] The relevant statute defines "principal" as "an individual or association that: (1) spends more than $3,000 in the aggregate in any calendar year to engage a lobbyist, compensate a lobbyist, or authorize the expenditure of money by a lobbyist; or (2) spends a total of at least $50,000 in any calendar year to influence legislative action, administrative action, or the official action of political subdivisions, as described in section 10A.04, subdivision 6." Minn. Stat. § 10A.01, subd. 33.

(*Id.* ¶ 33.) And in 2020, activists targeted a vendor that Minnesota Right to Life hired for a direct mailing campaign. (*Id.* ¶¶ 35–36.) As a result, under pressure to stop doing business with Minnesota Right to Life, the vendor cut off the organization's mailbox access while the campaign was ongoing. (*Id.* ¶ 36.)

As such, Plaintiffs are reluctant to disclose the names and addresses of their advertising vendors. (*Id.* ¶ 39.) When possible, Plaintiffs avoid advertising spending in quantities that would trigger the vendor-disclosure requirement. (*Id.* ¶ 41.) Still, their spending sometimes exceeds the $2,000 statutory threshold—as it did during the 2024 reporting period. (*Id.* ¶ 42.)

For that year, Plaintiffs failed to file the required lobbyist principal reports identifying their vendors. (*Id.* ¶ 45.) The state Campaign Finance and Public Disclosure Board contacted Plaintiffs by mail on April 1, 2025, threatening to impose a civil penalty if they refused to file the report. (ECF No. 9-1.)

On June 13, 2025, Plaintiffs sued members of the Campaign Finance and Public Disclosure Board (the "State"), all in their official capacities. (Compl. ¶¶ 6–15.) Plaintiffs allege two counts of First Amendment violations but only seek a preliminary injunction as to the second: prohibiting enforcement of the vendor-disclosure requirement. (Compl. ¶¶ 50–63; ECF No. 8 ("Mot.") at 3.[2])

---

[2] All page citations to the record reference ECF pagination.

# ANALYSIS

## I.   Legal Standard

A preliminary injunction is an extraordinary remedy that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis omitted). In determining whether to issue injunctive relief, the Court applies the familiar *Dataphase* factors: (1) the movants' likelihood of success on the merits; (2) the threat of irreparable harm to the movant absent the injunction; (3) the balance of the harms between issuance and nonissuance of the injunction; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*).

## II.  Standing

To establish standing, Plaintiffs bear the burden of proving that they (1) suffered a cognizable injury (2) that the defendants caused, and (3) that would be redressed with a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

Injury-in-fact for a First Amendment claim, however, can come in two forms. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016). First, Plaintiffs could establish standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.* Second, Plaintiffs can

4

establish standing by "alleging that [they] self-censored." *Id.* (citing *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011)). "The relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute was 'objectively reasonable.'" *281 Care Comm.*, 638 F.3d at 627 (citation omitted). Importantly, a "First Amendment plaintiff who faces a credible threat of future prosecution suffers from an ongoing injury resulting from the statute's *chilling effect* on his desire to exercise his First Amendment rights." *Missourians for Fiscal Accountability*, 830 F.3d at 794 (quotation marks and citation omitted); *see also id.* at 795 (noting that "non-criminal consequences contemplated by a challenged statute can also contribute to the objective reasonableness of alleged chill" (citation omitted)).

The State contends that Plaintiffs lack standing because their injury is speculative and stems from harassment by third parties, not government officials. (ECF No. 39 ("Opp.") at 5–8.) But on the face of the Complaint, Plaintiffs claim injury from the vendor-disclosure law itself. The Court concludes that Plaintiffs have two independent bases for standing.

First, Plaintiffs can assert standing as regulated entities. Generally, "[t]he imposition of a regulatory burden itself causes injury." *Tennessee v. EEOC*, 129 F.4th 452, 458 (8th Cir. 2025). This is especially true where, as here, the regulatory burden compels action. "When the suit is one challenging the legality of government action" and "the plaintiff is himself an object of the action (or foregone action) at issue," "there is ordinarily

5

little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. Plaintiffs claim injury from the statute's requirement to disclose vendor information, which they would have otherwise chosen to keep private. (ECF No. 9 ("Dorr Decl.") ¶ 16.) Standing is straightforward.

Second, Plaintiffs have properly claimed a First Amendment injury. The Supreme Court has held that the "deterrent effect on the exercise of First Amendment rights . . . arises as an inevitable result of the government's conduct in requiring disclosure." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (quotation marks and citation omitted). The deterrence contemplated in *Bonta* plays out here too. Based in part on past experience with severe harassment, Plaintiffs fear that disclosing vendor information would expose business partners to more of the same, thus disrupting the organizations' advocacy. (Compl. ¶ 38; Dorr Decl. ¶ 16.) As a result, Plaintiffs claim that they must "decide whether an advertisement that costs more than $2,000"—the statutory threshold for disclosure—"will be worth the risk from revealing [their] vendors' identities." (Dorr Decl. ¶ 17.) This self-censorship in the face of compelled disclosure is reasonable, creating an injury in fact. *281 Care Comm.*, 638 F.3d at 627.

### III.   Likelihood of Success on the Merits

A statute compelling disclosure of information to the government related to political activity typically faces "exacting scrutiny." *Dakotans for Health v. Noem*, 52 F.4th

381, 389 (8th Cir. 2022) (citing *Bonta*, 594 U.S. at 607). To survive exacting scrutiny, the State must show (1) a "sufficiently important governmental interest" (2) bearing a "substantial relation" to the disclosure requirement. *Bonta*, 594 U.S. at 607. In turn, (3) the disclosure requirement must be narrowly tailored to that interest. *Id.* at 608.

The parties frame said governmental interest differently. The State claims a broad interest in transparency surrounding influences on legislators' decision-making (Opp. at 12–13), and Plaintiffs assert that the State has no interest in vendor information itself (Mot. at 15–16.). Ultimately, this disagreement about the scope of the State's interest is not dispositive.

Even if the Court accepts the State's argument that it has a strong interest in transparency, Plaintiffs still prevail because the vendor-disclosure requirement is not substantially related to that interest. The State contends that vendor information furthers the goal of transparency because it enables the public and public officials to "detect patterns in advocacy," such as coordinating organizations using the same vendor or vendors reaching different target audiences. (Opp. at 14–16.) This argument fails for at least three reasons.

First, vendors are not the true speaker behind the spending. In a case involving individuals paid by special-interest groups to circulate ballot petitions, the Supreme Court distinguished between the *payor* and the *payee*. *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 203 (1999). Whereas information about the sponsors behind ballot initiatives

7

responded to a substantial state interest, the Court noted that the "added benefit" of revealing information about the paid circulators was "hardly apparent." *Id.* The same is true here. The State's briefing repeatedly suggests that nothing about the vendors themselves is of interest; collecting vendor information is merely a means to the end of learning more about those who pay them. (Opp. at 14–16.)

Second, even if it were enough for vendor information to provide meaningful insight into the lobbying principals, the State has cited no concrete evidence that it actually does so. When defending a burden on speech, the government "must do more than simply posit the existence of the disease sought to be cured." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (quotation marks and citation omitted). Rather, it must "point to record evidence or legislative findings demonstrating the need to address a special problem." *Id.* (quotation marks and citation omitted). For its part, the State points only to hearing and written testimony by Jeffrey Sigurdson, executive director of the Minnesota Campaign Finance and Public Disclosure Board. (*See* Opp. at 14–15; ECF No. 40 ("Sigurdson Decl.") ¶ 1.) Mr. Sigurdson offers general assertions, accompanied by a single hypothetical example, about the "important role" of vendor-disclosure. (Sigurdson Decl. ¶ 7.) The State's underdeveloped record does not contain "a single, concrete instance" where real-life vendor information advanced the interest of transparency. *See Bonta*, 594 U.S. at 613.

And third, even if vendor information did provide meaningful insight about lobbying principals, the mechanics of the disclosure requirement obstruct that goal rather than further it. Because lobbying principals need not report vendor information until the following year, the public would not have access to that information until well after the advertisement runs and the legislative session ends. *See* Minn. Stat. § 10A.04, subd. 6(a). Likewise, in *Buckley*, the Court observed that a report containing the names of paid circulators does not aid a member of the public, who would not have that information on hand when the circulator approached them. 525 U.S. at 203 n.22. This Court similarly doubts the disclosure requirement's efficacy.

Put together, there is a "dramatic mismatch" between "the interest that the [State] seeks to promote and the disclosure regime that [it] has implemented in service of that end." *Bonta*, 594 U.S. at 612.

Because the State's argument fails on this first prong, the Court need not address the narrow tailoring question and concludes that Plaintiffs are likely to succeed on the merits.

**IV.    Other Preliminary Injunction Factors**

As reflected in the parties' briefing, the balance of harms and public interest *Dataphase* factors rise and fall with Plaintiffs' likelihood of success on the merits. (*E.g.*,

Mot. at 20; Opp. at 24.) Because the Court concludes Plaintiffs are likely to succeed on the merits, those other factors weigh in Plaintiffs' favor.

All that remains is whether Plaintiffs face a threat of irreparable harm absent a preliminary injunction. The State argues that Plaintiffs' delay in suing—until long after the law was enacted, and months after receiving the civil penalty notice—is evidence that they do not face any immediate harm. (Opp. at 21–22.) Yet the State also argues that Plaintiffs sued too *early* because they did not disclose the vendor information, so they have not suffered an injury yet. (*Id.* at 23.) In essence, the State claims that is both too early and too late for Plaintiffs to suffer immediate, irreparable harm. Neither argument persuades the Court.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 7) is GRANTED.

2. The State is enjoined from enforcing Minn. Stat. § 10A.04, subd. 6(d) against Plaintiffs.

Dated: October 20, 2025                              BY THE COURT:

                                                     s/Nancy E. Brasel
                                                     Nancy E. Brasel
                                                     United States District Judge